## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## WEST PALM BEACH DIVISION

| | |
|---|---|
| ISAAC MARCUSHAMER, individually and on behalf of all others similarly situated, | CASE NO.: |
| Plaintiff, | **CLASS ACTION** |
| vs. | COMPLAINT FOR: |
| ALLY FINANCIAL INC., a Delaware Corporation; ALLY BANK LEASE TRUST, a Delaware Entity, | (1) BREACH OF CONTRACT; |
| Defendant. | (2) VIOLATION OF THE CONSUMER LEASING ACT (15 U.S.C. § 1667a *et seq.*); |
| | (3) VIOLATION OF THE FLORIDA MOTOR VEHICLE LEASE DISCLOSURE ACT (Fla. Stat. § 521.004); |
| | (4) VIOLATION OF THE DECEPTIVE & UNFAIR TRADE PRACTICES ACT; and |
| | (5) DECLARATORY RELIEF |
| | **JURY TRIAL DEMANDED** |

Plaintiff, ISAAC MARCUSHAMER ("Plaintiff"), on behalf of himself and all others similarly situated (the "Class"), brings this action against Defendants, ALLY FINANCIAL INC. and ALLY BANK LEASE TRUST ("Ally" or "Defendants"), for breach of contract, violation of the Consumer Leasing Act, 15 U.S.C. § 1667a *et seq.* (the "CLA"), violation of the Florida Motor Vehicle Lease Disclosure Act, Fla. Stat. § 521.001 *et seq.* ("FMVLDA"), violation of Florida's Deceptive & Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq.* ("FDUTPA"), and declaratory relief. The following allegations are based upon Plaintiff's personal knowledge with respect to his own acts and based upon information and belief as to all other matters.

## INTRODUCTION

1.      This is a class action brought pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of Plaintiff and all others similarly situated in the United States and Florida who leased a vehicle through Ally that failed to disclose the conditions and charges associated with an "Early Termination Dealer Purchase for Inventory" ("ET DI") transaction and/or who were charged improper fees in connection with an ET DI transaction.

2.      According to Ally's financial reports, Ally originates over $10 billion in automobile leases in the United States per year, with hundreds of thousands of consumers.

3.      All of Ally's leases are executed pursuant to a standard form contract that Ally calls the "SmartLease" agreement. (**Exhibit A**.)

4.      Ally distributes blank copies of its SmartLease agreement to automobile dealerships ("dealers") throughout the United States, including Florida.  If a customer wishes to lease their vehicle from their dealer, the customer will enter into a SmartLease Agreement with the dealer.  The dealer will then immediately assign the contract to Ally, who takes over all of the lessor obligations under the agreement.

### A.  Relevant Terms of SmartLease Agreement

5.      The SmartLease Agreement discloses that there are two conditions pursuant to which the customer (the "lessee") may voluntarily end the lease before the start of the last monthly period (an "early termination").[1]  (Exhibit A, §§ 32, 36.)

         a.      The first option is the lessee may choose to purchase the vehicle for (a) a set price set forth in the contract (typically the "Residual Value" listed on the agreement), plus (b)

---

[1] This does not include involuntary terminations such as repossession or a total loss of the vehicle.

the base monthly payment times the number of payments not yet due, minus (c) any unearned rent charge for the unused month(s) of the lease, plus (d) any related official fees and taxes. (Exhibit A, § 32.) This option is referred to herein as the "Purchase Option."

        b.    The second option is the lessee may terminate the lease early by paying an "Early End Charge." The "Early End Charge" is calculated by adding (a) the base monthly payment times the number of payments not yet due, minus (b) any unearned rent charge for the unused month(s) of the lease, minus (c) any "Surplus" as defined in the agreement.[2] (Exhibit A, § 36(a).) If there is no "Surplus" then the lessee will also owe Ally any "Early Excess Mileage and Wear Charges." (Id.) In addition, the lessee may also owe a disposition fee (in an amount set forth in the agreement), plus any unpaid fees or taxes. (Id., §§ 3, 41.)

      6.    In determining the "Early End Charge," the SmartLease Agreement defines the relevant terms as follows:

        a.    **Definition of "Surplus."** If the "Realized Value" of the vehicle is greater than the "Residual Value" then the excess amount is the "Surplus." (Exhibit A, § 36(b).)

        b.    **Definition of "Realized Value."** The SmartLease Agreement provides that Ally will sell the vehicle at wholesale and use the "sale price of the vehicle as its Realized Value." (Exhibit A, § 36(b).) However, the contract further provides that if the lessee pays for an independent appraisal of the wholesale value from a third-party appraiser agreed to by the Parties, then the appraised value will be used as the "Realized Value." (Id.)

        c.    **Definition of "Residual Value."** The "Residual Value" is the value of the vehicle at the end of the lease that was used to determine the lessee's base scheduled payments.

---

[2] If the total of this calculation is less than zero, then the customer will not owe any additional amounts. (Exhibit A, § 36.) However, they will not be entitled to a refund or credit from the lessor. (Id.)

(Exhibit A, § 7.)  The amount of the "Residual Value" is determined at the beginning of the lease and set forth in the agreement.  (Id.)

7.  The SmartLease Agreement provides that the lessee cannot transfer any right or interest under the lease without Ally's prior written consent.  (Exhibit A, § 45.)

8.  The SmartLease Agreement does not provide any standards for how Ally will exercise its discretion to consent to transfers of rights or interests under the lease.  (Exhibit A, § 45.)

## B.  **General Description of Ally's Wrongful Practices**

9.  Even though the SmartLease Agreement provides the two early termination options, Ally refuses to directly sell the vehicle to its lessees upon early termination and refuses to directly accept any "Early End Charges."  Instead, Ally forces its lessees to work with dealers approved by Ally to exercise their early termination options.  The dealers are agents of Ally responsible for handling Ally's lease obligations.

10.  Unbeknownst to its lessees, Ally encourages the dealers to offer a third early termination option that is not disclosed in the SmartLease Agreement.  This option is known as an "Early Termination Dealer Purchase for Inventory" ("ET DI") transaction.  Under this transaction, Ally will agree to sell the vehicle to the dealer at a quoted amount reflecting Ally's view of the fair market value of the vehicle plus the amount Ally will accept in satisfaction of the early termination obligations of the lessee (the "ET DI Quote").

11.  Generally, the ET DI Quote will be greater than the Residual Value of the vehicle plus the remaining monthly payment(s) owed by the lessee.  In other words, there will be a "Surplus," as defined by the SmartLease Agreement, because Ally's "Realized Value" on the vehicle will be greater than the "Residual Value."  (Exhibit A, § 36.)  Further, because the

"Surplus" will be greater than the remaining monthly payments owed under the lease, the lessee should not owe any "Early End Charges" under the formula set forth in the SmartLease Agreement. (Id.) In sum, if a customer selects the ET DI option, it should not owe any additional money under the terms of the SmartLease Agreement.

12.     Nevertheless, Ally's agents (the dealers) will often charge the lessee an additional fee to subsidize the dealer's cost to purchase the vehicle from Ally in an ET DI transaction. In fact, the ET DI Quote is typically so high that the only way the transaction will make economic sense for the dealer is if the dealer receives some money from the lessee; otherwise, the dealer would not be able to make a profit when it resells the vehicle. Ally is fully aware that its agents will and do, at times, charge lessees additional fees as part of an ET DI transaction, and that the money Ally receives from its agents (the dealers) in an ET DI transaction includes such additional fees collected from the lessees.

13.     This ET DI process and the associated charges for the lessee are not disclosed in the SmartLease Agreement. This omission constitutes a violation of the federal Consumer Leasing Act, 15 U.S.C. § 1667a et seq. (the "CLA") and the Florida Motor Vehicle Lease Disclosure Act, Fla. Stat. § 521.001 et seq. ("FMVLDA").

14.     Pursuant to the CLA, the lessor is required to provide a written statement to the lessee setting out "accurately and in a clear and conspicuous manner" certain information about the lease, including "[a] statement of the conditions under which the lessee or lessor may terminate the lease prior to the end of the term and the amount or method of determining any penalty or other charge for . . . early termination." (15 U.S.C. § 1667a(11).) The purpose of the CLA is to provide consumers with meaningful information about the component and aggregate costs of consumer

leases, so they can make better informed choices between leases, and between leases and credit sales.

15.      The FMVLDA similarly requires lease agreements to include the "descriptions and disclosures set forth and required" by the CLA, unless the lessor includes alternative Florida specific disclosures required by the statute. (Fla. Stat. § 521.004(1).)

16.      By failing to disclose the ET DI process in the SmartLease Agreement, and any associated charges therewith, Ally failed to fully disclose all of the conditions under which the lessor may terminate the lease and the amount or method of determining the associated charges with an early termination. This omission constitutes a violation of the CLA and FMVLDA. This violation harmed Plaintiff and the Class because they could not make fully informed decisions about their lease options, their early termination options, and the full cost of such options.

17.      In addition, Ally employed, and continues to employ, unfair and deceptive practices that force lessees to select the ET DI option, often at a greater cost to the lessee.

18.      *First,* Ally, as a matter of company policy, will never allow the lessee to transfer to a dealer the right to purchase the vehicle at the "Purchase Option" price. This prevents the lessee from directly selling the vehicle to the dealer at the "Vehicle Option" purchase price, even if Ally would recover the full amount owed under the lease. Ally unreasonably withholds its consent to such transfers, so it can obtain a higher price from the dealer through the ET DI process.

19.      For example, assume under the SmartLease Agreement the lessee could purchase the vehicle for $24,000 under the "Purchase Option." If a dealer was willing to pay $25,000 for the vehicle, then Ally would receive everything it would be entitled to under the SmartLease Agreement. Instead, to make more money, Ally will offer to sell the car to the dealer for $26,000

through the ET DI process and will refuse to allow the lessee to sell the vehicle directly to the dealer at the lower "Purchase Option" price.

20.     *Second*, when a lessee turns in their vehicle under the "Early End Charge" option, the lessee will not know the actual amount they will be charged, because that amount will vary depending on whether the "Realized Value" that Ally subsequently obtains for the vehicle is greater than the "Residual Value."  In other words, the true cost of this option will depend on whether there is a "Surplus."  (Exhibit A, § 36(a).)  If there is no "Surplus," then the lessee may owe substantial "Early Excess Mileage and Wear Charges" in addition to their remaining monthly payments and a disposition fee. (*Id.*, § 36(a), (c).)  Consequently, because the lessee has no control or visibility into the price Ally is ultimately able to obtain on the wholesale market for the vehicle, the lessee is essentially "blind" to the true cost of the "Early End Charge" option.

21.     *Third,* to theoretically address the lessee's lack of information about the "Early End Charge," the SmartLease Agreement provides that the lessee may pay for an independent appraisal of the wholesale value, which will then be used as the "Realized Value" of the vehicle when determining whether there is a "Surplus" for purposes of calculating the "Early End Charge." (Exhibit A, § 36(a).)  However, this purported option is completely illusory.  To exercise this option, Ally must agree on the appraiser. (*Id.*)  As Plaintiff discovered, Ally does not have any procedures in place for agreeing on the appraiser, thereby preventing any lessee from exercising this option in the real world.  It is a complete sham.

22.     *Fourth*, if a lessee selects the "Purchase Option," it will take thirty (30) days or more for the title to transfer to the lessee.  This prevents the lessee from simultaneously purchasing the vehicle and directly selling it to the dealer at a lower price than the ET DI quote.

23.     For all of these reasons, lessees often agree to the ET DI process, even though Ally, through its agent (the dealer), is going to charge them money for exercising this option.  This is because the ET DI process provides certainty regarding the cost and finality for the transaction. But this cost is not disclosed in the SmartLease Agreement in violation of Ally's disclosure requirements under the CLA and FMVLDA.

24.     In June 2018, Ally entered into a nationwide class action settlement concerning similar misconduct related to the "Purchase Option."  In that class action, entitled *Schreiber v. Ally Financial Inc. et al.*, Civil Action No. 1:14-cv-22069 (S.D. Fla 2014), the plaintiff alleged that Ally violated the CLA and breached its leasing contracts by refusing to sell the vehicles at the Purchase Option price stated in the SmartLease Agreement, and requiring Plaintiff to purchase the vehicles from a dealer for a price higher than the price stated in the contracts.  Ally settled the case for over $19.7 million and offered to refund 100% of the additional charges imposed by the dealers.

25.     This case presents similar wrongdoing.  Plaintiff and the Class should not have been charged any amounts by the dealers as part of the ET DI process, and such amounts constitute undisclosed early termination charges in violation of the CLA and FMVLDA and in breach of the SmartLease Agreement.  Further, Ally's failure to offer an appraisal process as expressly provided for in the SmartLease Agreement constitutes a breach of the SmartLease agreement and an unfair and deceptive business practice in violation of the CLA, FMVLDA and FDUTPA.  In addition, Ally's refusal to allow Plaintiff and the Class to transfer their right to purchase the leased vehicle to a dealer when the sale would fully compensate Ally for the amounts owed under the lease constitutes a breach of the covenant of good faith and fair dealing and is an unfair and deceptive business practice in violation of FDUTPA.

26.     Based on the foregoing, Plaintiff on behalf of himself and the Class is seeking:

a.       Damages, including but not limited to any amounts paid by lessees in an ET DI transaction;

b.       Statutory damages for the violation of the CLA on behalf of the Class in the amount of $1,000,000.00 pursuant to 15 U.S.C. § 1640(a)(2)(B);

c.       Civil penalties for the violation of the FMVLDA in the amount of $1,000.00 per each Class Member's lease transaction pursuant to Fla. St. § 512.006(1);

d.       An injunction requiring Ally to:

    i.       Fully disclose the ET DI process in its SmartLease Agreement and that the lessee should not be charged any money by Ally or the dealer in such a transaction;

    ii.      Implement procedures to allow lessees to exercise the independent appraisal option offered in the SmartLease Agreement; and

    iii.     Permit lessees to transfer their right to purchase the vehicle at the "Purchase Option" price, so that lessees may directly sell the leased vehicle to the dealer while simultaneously ensuring that Ally will receive the full amount it is entitled to under the lease;

e.       Reasonable attorney fees and costs; and

f.       All other relief that is just and proper.

**PARTIES**

27.     At all relevant times, Plaintiff, Isaac Marcushamer, was and is an individual over the age of twenty-one residing in Miami-Dade County, Florida, within the Southern District of Florida.

28.     At all relevant times, Defendant, Ally Financial Inc., was and is a financial services corporation registered in the State of Delaware.  Defendant, Ally Financial Inc.'s principal place

of business is located in Detroit, Michigan. Defendant, Ally Financial Inc., directed its business activities, including the financing and servicing of auto leases acquired by Defendant, Ally Bank Lease Trust, to residents of the State of Florida, including residents within this District, from which it has derived pecuniary gain.

29.    At all relevant times, Defendant, Ally Bank Lease Trust, was and is a special purpose Delaware statutory trust fund which acquires vehicles and related consumer leases from dealers. Defendant, Ally Bank Lease Trust's principal place of business is located in Detroit, Michigan. Defendant, Ally Bank Lease Trust, directed its business activities, including the acquisition of auto leases, to residents of the State of Florida, including residents within this District, from which it has derived pecuniary gain.

30.    Both Ally Financial Inc. and Ally Bank Lease Trust were referred to interchangeably as the assignee of Plaintiff's SmartLease Agreement.

31.    On information and belief, Plaintiff alleges that, at all relevant times, each Defendant was acting as a partner, agent, servant and/or employee of the remaining Defendants, within the course and scope of such agency and with the knowledge and/or understanding of the remaining Defendants.

32.    If necessary, Plaintiff will seek to amend this Complaint to reflect Defendants' true names and capacities when they have been ascertained if not correctly named or yet named. Plaintiff is informed and believes, and thus alleges, that each defendant is responsible, jointly and severally, for the events and injuries described herein that caused damage to Plaintiff and the Class.

33.    At all relevant times, the dealers that are authorized by Ally to perform its end of lease obligations under the SmartLease Agreement are agents of Ally, and all actions by the dealers

alleged herein were in the course and scope of such agency. Ally is liable for the actions of these agents under the doctrine of *respondeat superior* and similar legal doctrines.

## JURISDICTION AND VENUE

34.      This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d) ("CAFA"), because at least one Class Member is of diverse citizenship from one of the defendants, there are 100 or more Class Members nationwide, and the aggregate amount in controversy exceeds $5,000,000.00. This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because Plaintiff's CLA claims arise under the laws of the United States, and this Court has supplemental jurisdiction over Plaintiff's remaining claims.

35.      Venue is proper in this District under 28 U.S.C. § 1391 because Plaintiff is a resident of this District and a substantial portion of the events or omissions giving rise to this action occurred in this District.

36.      This Court may exercise personal jurisdiction over Ally pursuant to Fla. Stat. § 48.193, because this action arises out of Ally, personally or through an agent, operating, conducting, engaging in, and/or carrying out a business or business venture in the State of Florida. Further, this Court may exercise personal jurisdiction over Ally because Ally, personally or through an agent, breached a contract within the State of Florida. This Court may also exercise personal jurisdiction over Ally because Ally, personally or through an agent, engaged in substantial and not isolated activity in the State of Florida.

## FACTUAL ALLEGATIONS CONCERNING PLAINTIFF

37.      On or about May 13, 2017, Plaintiff entered into a SmartLease Agreement with Napleton's North Palm Auto Park in Lake Park, Florida. The SmartLease Agreement was

immediately sold and assigned to Ally, which was referred to interchangeably in the agreement as Ally Bank Lease Trust and Ally Financial.  (Exhibit A, p. 1.)  A true and correct copy of Plaintiff's SmartLease Agreement is attached as **Exhibit A**.

38.     The term of Plaintiff's SmartLease Agreement was 42 months and was scheduled to end on November 12, 2020.  (Exhibit A, §§ 2(a), 7(h).)  The base scheduled payment was $463.43 plus $32.44 in sales tax for a total scheduled payment of $495.87.  (Id., §§ 2(a), 7(i), (j), (l).)

39.     The "Residual Value of Plaintiff's vehicle was $22,303.85.  (Exhibit A, § 7(d).)

40.     The SmartLease Agreement stated that Plaintiff may end the lease at any time. (Exhibit A, § 29.)

41.     The SmartLease Agreement provided that Plaintiff would have the option of purchasing the vehicle at the end of the lease for $22,303.85 (i.e., the same amount as the "Residual Value").  (Exhibit A, § 9.)  If Plaintiff ended his lease before the start of the last monthly period and still wanted to purchase the vehicle, then Plaintiff would also owe his "base monthly payment times the number of payments not yet due" minus any "unearned rent charge" for the remaining term of the lease.  (Id., § 32.)

42.     Section 36(a) of the SmartLease Agreement set forth the amount of money Plaintiff would owe if he ended the lease before the last monthly period and he did not purchase the vehicle. It provided as follows:

> 36. What You Owe If You End This Lease Before the Start of the Last Monthly Period, and You Do Not Buy the Vehicle - Monthly Payment Lease.
> (a) What You Owe: You will owe us an Early End Charge as follows:
>     The base monthly payment times the number of payments not yet due,
>     • Any unearned rent charge figured by the Actuarial Method (see Section 42), based on the number of full monthly periods between early end and scheduled end
>     • Any Surplus (see definition in this section) on the vehicle sale
>     = The total. If this total is less than zero, we will not give you a refund or credit.
>
> If there is no Surplus, you will also owe us any Early Excess Mileage and Wear Charge (see definition in this section).
>
> You will also owe us: (1) any Disposition Fee shown in Section 3 (unless waived; see Section 14); and (2) any additional amounts due under Section 41. We will give you any credits due under Section 41.

(Exhibit A, § 36(a).)

43.      Section 36(b) provided the definitions of "Realized Value" and "Surplus" as set

forth below:

> (b) Definition of "Realized Value" and "Surplus": We will sell the vehicle at wholesale. We will use the sale price of the vehicle as its Realized Value, unless you get an independent appraisal of the wholesale value of the vehicle that could be realized at sale (see below in this section). If you get such an appraisal, we will use the appraised value of the vehicle as its Realized Value. If the Realized Value exceeds Residual Value (Section 7(d)), the excess is the Surplus. If the Realized Value is the same as or less than Residual Value, there is no Surplus.

(Exhibit A, § 36(b).)

44.      Section 36(b) provided Plaintiff with the contractual right to obtain an independent

appraisal of the vehicle's wholesale value as set forth below:

> Your Right to Obtain an Independent Appraisal of the Vehicle's Wholesale Value. You may get a professional appraisal of the wholesale value of the vehicle that could be realized at sale. The appraiser must be an independent third party. You and we must agree on the appraiser. You must pay for the appraisal and get it within a reasonable time after lease end. The appraised value will then be used as the Realized Value.

(Exhibit A, § 36(b).)

45.      On or about August 31, 2020, Plaintiff had two payments remaining under his

SmartLease Agreement.  He took his vehicle to CarMax to obtain an appraisal.  CarMax offered

to buy the car from Plaintiff for $24,000.00.  The offer stated that it was "good for 7 days." (Exhibit

B.)  A true and correct copy of the CarMax appraisal offer is attached as **Exhibit B**.

46.      Plaintiff calculated that he would owe Ally approximately $23,295.59 if he

exercised the "Purchase Option" under the Smart Lease Agreement ($22,303.85 + $991.74 for the

remaining two base monthly payments.)  Consequently, if CarMax purchased the car for $24,000,

then Ally would receive everything it was owed under the SmartLease Agreement and Plaintiff

would owe nothing—and would in fact make a profit on the deal.  However, when CarMax

contacted Ally to buy-out the lease, Ally told CarMax it would need to pay $27,575.00 to Ally to

buy the vehicle.  A true and correct copy of the payoff information CarMax received from Ally is attached as **Exhibit C**.

47.      Plaintiff immediately called Ally.  Plaintiff informed Ally that under his SmartLease Agreement, the "Purchase Option" price was approximately $23,295.59 not $27,575.00.  The Ally representative told Plaintiff that the "Purchase Option" price was only available if Plaintiff bought the vehicle, and he could not make this purchase through CarMax.

48.      Plaintiff asked the Ally representative to identify what provision in the SmartLease Agreement prohibited him from exercising the "Purchase Option" through CarMax.  The representative could not identify any provision but explained that this was Ally's "company policy."

49.      Ally was presumably relying on Section 45 of the SmartLease Agreement which provides that the lessee "cannot transfer . . . any right or interest you have under this lease or in the vehicle without our prior written consent."  (Exhibit A, § 45.)  The Smart Lease Agreement does not provide any standards for how Ally will exercise its discretion to consent to such transfers. (*Id.*)

50.      During the same telephone call, Plaintiff offered to buy the vehicle directly from Ally that day.  The Ally representative informed Plaintiff that he could not purchase the car directly from Ally, and that he would need to purchase the vehicle through an Ally authorized dealer. Plaintiff was further told that this process would take at least 30 days before he would receive the title to the vehicle.  The CarMax offer was only good for 7 days, so this was not a viable option.

51.      Plaintiff then asked why Ally would care if it is receiving the "Purchase Option" price directly from him as opposed to indirectly from a sale through CarMax.  The Ally representative did not have any answer, other than to explain that it was company policy.

52.     That night, Plaintiff reviewed Section 36 of his SmartLease Agreement to determine how much it would cost to end his lease early assuming he did not purchase the vehicle (i.e., the "Early End Charge").   Plaintiff determined this cost would depend on whether the wholesale price obtained by Ally when it subsequently sold the vehicle (i.e., the "Realized Value") would be greater than the "Residual Value" and thus result in a positive "Surplus." (Exhibit A, § 36.)

53.     Plaintiff then reviewed Section 36(c) of the SmartLease Agreement, which provided that Plaintiff could pay for an independent appraisal of the vehicle's "wholesale value" which then would be used as the "Realized Value" for purposes of determining whether Plaintiff owed an "Early End Charges" and, if so, the amount of such charges.

54.     Accordingly, the next day, on or about September 1, 2020, Plaintiff paid $375.00 to have his car appraised by an independent appraiser (Stuart Raskin of South Florida Auto Appraisers - I.A.A.A. Certification No. 1003300011).  The appraised wholesale value of Plaintiff's vehicle was $24,900.00. (Exhibit D, p. 16.)  A true and correct copy of the Independent Appraisal is attached as **Exhibit D**.

55.     Plaintiff then calculated what his "Early End Charge" would be under the SmartLease Agreement using the independent appraisal as the "Realized Value."

a.     *First*, he calculated that the "Realized Value" based on the independent appraisal ($24,900.00) minus the "Residual Value" ($22,303.85) would result in a positive "Surplus" of $2,596.15. (Exhibit A, § 36(b).)

b.     *Second*, as a result of a positive Surplus, Plaintiff determined he would not owe any "Early Excess Mileage and Wear Charge" because the SmartLease Agreement states that Plaintiff will only owe this charge if "there is no Surplus." (Exhibit A, § 36(a).)

c.      *Third,* he subtracted the Surplus ($2,596.15) from the remaining base monthly payments he owed under the lease ($991.74), which resulted in a negative number. As a result, under the terms of the SmartLease Agreement, he would not owe any "Early End Charges." In other words, so long as Ally agreed to use the independent appraisal of $24,900 as the "Realized Value" of the vehicle—as promised in the SmartLease Agreement—then Plaintiff would not owe any fees for terminating his lease early. (Exhibit A, § 36(a), (b).)

56.      On the same day he received the appraisal, Plaintiff contacted Ally so that the parties could agree on the appraiser as provided in the SmartLease Agreement. The Ally representative informed Plaintiff that she was not aware of any procedures that would allow Plaintiff to obtain an independent appraisal or obtain Ally's consent to an appraiser. The Ally representative provided Plaintiff with other telephone numbers at Ally, but no one at the company was aware of any procedure to accept an independent appraisal or consent to an appraiser.

57.      The next day, on September 2, 2020, Plaintiff brought his vehicle to Hollywood Chrysler & Jeep located in Hollywood, Florida (the "Hollywood dealership"). The Hollywood dealership was listed as one of the dealers on Ally's website where Plaintiff could return his vehicle under the SmartLease Agreement.

58.      The salesperson from the Hollywood dealership presented Plaintiff with three options.

a.      The first option was Plaintiff could pay the remaining payments owed under the lease ($924.96) plus any "Excess Mileage and Wear Charges" (i.e., the "Early End Charge").

b.      The second option was a "Dealer Purchase for Inventory" transaction, whereby the dealer would purchase the vehicle from Ally for $27,575.00 (i.e., "ET DI Quote").

  c.  The third option was Plaintiff could purchase the vehicle for $23,228.81 (i.e., the "Purchase Option" price).

  59.  The salesperson showed Plaintiff a sheet from Ally entitled "Ally Vehicle Payoff Quote" which listed the three options.  The salesperson told Plaintiff he was not permitted to give him the sheet, so Plaintiff took a photograph of the sheet.  In the sheet, Ally instructs its dealers not to disclose the "Dealer Purchase for Inventory" (ET DI) price to the lessees.  A true and correct copy of the Ally Vehicle Payoff Quote is attached as **Exhibit E**.

  60.  The salesperson explained to Plaintiff that the Hollywood dealership was not willing to pay the full $27,575.00 that Ally was charging for an ET DI transaction.  However, if Plaintiff agreed to pay $1,000.00 toward that price, the Hollywood dealership would pay the rest.  This appeared to be the least risky option to Plaintiff, so Plaintiff agreed to pay the Hollywood dealership the $1,000.00.  Plaintiff was not willing to risk selecting the "Early End Charge" option because he did not know what wholesale value Ally would ultimately obtain in a subsequent auction of the vehicle, and thus could not calculate how much he would be charged under the "Early End Charge" option.  He also did not want to purchase the vehicle and risk being unable to sell the vehicle at a similar or greater price after the transaction was completed (which was estimated to take at least 30 days).

  61.  Plaintiff executed the Hollywood dealership's "Lease Termination Payoff Authorization and Verification Agreement," dated September 2, 2020, which authorized the Hollywood dealership to "payoff the above account" with Ally in the amount of $27,575.00.  (Exhibit F.)  A true and correct copy of the "Lease Termination Payoff Authorization and Verification Agreement" is attached as **Exhibit F**.

62.     Plaintiff also executed a Hollywood dealership "Purchase Form" indicating that Ally would be paid $27,575.00 for the vehicle and Plaintiff would pay $1,000.00.  A true and correct copy of the "Purchase Form" is attached as **Exhibit G**.  Plaintiff also received a receipt for the $1,000.00 payment, a true and correct copy of which is attached as **Exhibit H.**

63.     Under the terms of the SmartLease Agreement, Plaintiff should not have been charged any money to end the lease.  This is because the "Realized Value" received by Ally from this transaction ($27,575.00) minus the Residual Value ($22,303.85) resulted in a positive Surplus of $5,271.15.  This is greater than remaining payments Plaintiff owed under the lease ($924.96.) The positive Surplus also means that Plaintiff would not owe any "Excess Mileage and Wear Charges" because such amounts are only owed if "there is no Surplus."  (Exhibit A, § 36(a).)  As a result, Plaintiff did not owe any "Early End Charge" under the terms of the SmartLease Agreement.  (*Id.*)  Nevertheless, Plaintiff was charged $1,000.00 to end the lease by Ally and its agent, in breach of the SmartLease Agreement.

## CLASS ACTION ALLEGATIONS

64.     Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the following Class and Subclasses:

a.     **Nationwide Class for Breach of Contract.**  Plaintiff seeks to represent a nationwide class including (i) all persons who entered into Ally's SmartLease Agreement, (ii) who ended their lease agreements prior to the start of the last monthly period of the lease, and (iii) who were charged money by Ally or its agents (the dealers) in connection with an ET DI transaction (the "Breach of Contract Class").  The Class Period is based on each State's applicable statute of limitations.

      **b.**    **Nationwide Class for Damages for Violation of the CLA.**  Plaintiff seeks to represent a nationwide class including (i) all persons who entered into Ally's SmartLease Agreement, (ii) who ended their lease agreements prior to the start of the last monthly period of the lease, and (iii) who were charged money by Ally or its agents (the dealers) in connection with an ET DI transaction (the "CLA Damages Class").  The CLA Damages Class is limited to persons who terminated their lease within one-year prior to the filing date of this Action.

      **c.**    **Nationwide Class for Statutory Damages for Violation of the CLA**. Plaintiff seeks to represent a nationwide class including all persons who entered into Ally's SmartLease agreement and who terminated the lease within one-year prior to the filing date of this Action (the "CLA Statutory Damages Class").

      **d.**    **Florida Class for Damages Under the FMVLDA.**  Plaintiff seeks to represent a Florida class including (i) all persons who entered into Ally's SmartLease Agreement, (ii) who ended their lease agreements prior to the start of the last monthly period of the lease, and (iii) who were charged money by Ally or its agents (the dealers) in connection with an ET DI transaction (the "FMVLDA Damages Class").  The FMVLDA Damages Class is limited to persons who terminated their lease within one-year prior to the filing date of this Action.

      **e.**    **Florida Class for Penalties for Violation of the FMVLDA.**  Plaintiff seeks to represent a Florida class including all persons who entered into Ally's SmartLease agreement and who terminated the lease within one-year from the filing date of this Action (the "FMVLDA Penalty Class").

      **f.**    **Florida Class for Damages for Violations of the FDUTPA.**  Plaintiff seeks to represent a Florida class including (i) all persons who entered into Ally's SmartLease Agreement, (ii) who ended their lease agreements prior to the start of the last monthly period of

the lease, and (iii) who were charged money by Ally or its agents (the dealers) in connection with an ET DI transaction (the "FDUTPA Damages Class").  The FDUTPA Damages Class is limited to persons who terminated their lease within the four-year period prior to the filing date of this Action.

  **g.**  **Florida Class for Injunctive Relief for Violations of the FDUTPA.** Plaintiff seeks to represent a Florida class of all persons who entered into an Ally SmartLease Agreement within the last four years prior to the filing date of this Action (the "FDUTPA Injunctive Relief Class").

  65.  Excluded from the proposed Classes are: (a) Defendants and their agents, officers, directors, parent companies, subsidiaries, and affiliates; (b) counsel representing Plaintiff and any person employed by counsel; and (c) any judicial officers assigned to this case and their staff.

  66.  The "Breach of Contract Class," the "CLA Damages Class" and the "CLA Statutory Damages Class" are referred to collectively as the "Nationwide Classes."  The "FMVLDA Damages Class," the "FMVLDA Penalty Class," the "FDUTPA Damages Class" and the "FDUTPA Injunctive Relief Class" are referred to collectively as the "Florida Classes."  The Nationwide Classes and the Florida Classes are referred to collectively as the "Class" or "Classes."

  67.  Plaintiff reserves the right to revise the definitions of the Classes based upon subsequently discovered information.

  68.  **Numerosity:** While the exact number of the members of the Classes are unknown to Plaintiff at this time and can only be determined through appropriate discovery, Plaintiff is informed and believes that each of the Nationwide Classes includes tens of thousands of members and each of the Florida Classes includes thousands of members.  Therefore, each of the Classes are sufficiently numerous that joinder of all members of the Classes in a single action is

impracticable under Rule 23(a)(1) of the Federal Rules of Civil Procedure, and the resolution of their claims through a class action will be of benefit to the parties and the Court.

69.     **Ascertainability:** The names and addresses of the members of the Classes are contained in Ally's records.   The identities of each of the members of the Classes may be ascertained through appropriate discovery from Ally and its agents.   Notice can be provided to the members of the Classes through direct mailing, email, publication, or otherwise using techniques and a form of notice similar to those customarily used in consumer class actions arising under State and Federal law.

70.     **Common Facts:** Common facts exist as to all members of the Classes and predominate over any issues affecting individual members of the Classes.   The common facts include the following:

a.     Plaintiff and the members of the Classes entered into the same standard form SmartLease Agreement.

b.     The relevant terms of the SmartLease Agreement are the same for Plaintiff and each of the members of the Classes.

c.     Ally did not disclose the ET DI procedures or associated charges in its SmartLease Agreement.

d.     Ally's policies, procedures and practices concerning early termination of leases and ET DI transactions are and were the same for Plaintiff and all Class Members.

e.     Ally, in practice, does not allow lessees to obtain an independent appraisal of the vehicle's wholesale value to be used as the vehicle's "Realized Value" despite expressly promising to offer this option in its SmartLease Agreement.

      f.        Ally, as a matter of company policy, refuses to allow lessees to transfer to the dealers their right to purchase the vehicle at the "Purchase Option" price by unreasonably withholding its consent to such transfers, even though Ally will recover the full amount it is entitled to under the lease.

71.     **Common Questions of Law:** Common questions of law exist as to all members of the Classes and predominate over any issues solely affecting individual members of the Classes. The common questions of law include, but are not limited to:

      a.        Whether the SmartLease Agreement violates the CLA by failing to disclose the ET DI option and associated charges for an early termination of the lease.

      b.        Whether the SmartLease Agreement violates the FMVLDA by failing to disclose the ET DI option and associated charges for an early termination of the lease.

      c.        Whether the SmartLease Agreement violates the CLA by including an "independent appraisal" option that is not available in practice.

      d.        Whether the SmartLease Agreement violates the FMVLDA by including an "independent appraisal" option that is not available in practice.

      e.        Whether charging customers for ET DI transactions is a breach of the terms of the SmartLease Agreement.

      f.        Whether Ally's practice of refusing to allow lessees to sell their vehicles to dealers at the "Vehicle Option" purchase price is a breach of the SmartLease Agreement and the implied covenant of good faith and fair dealing.

      g.        Whether charging customers for ET DI transactions, and/or allowing its agents (the dealers) to do so, is a deceptive and unfair business practice in violation of FDUTPA.

h.      Whether Ally's failure to permit lessees from using an independent appraisal as the "Realized Value" of the vehicle, despite including an express provision in the SmartLease Agreement offering this option is a deceptive and unfair business practice in violation of FDUTPA.

i.      Whether Ally's practice of refusing to allow lessees to transfer to the dealer their right to purchase the vehicle at "Vehicle Option" purchase price, even though Ally would receive all of the money it is entitled to under the lease, is a deceptive and unfair business practice in violation of FDUTPA.

72.     **Typicality:** Plaintiff's claims are typical of the claims of the members of the Classes.  Plaintiff, like the other members of the Classes, entered into the same form SmartLease Agreement that failed to include the full and accurate disclosures required by the CLA and FMVLDA.  Plaintiff has been subjected to the same wrongful business practices and has been damaged in the same manner as the members of the Damage Classes, because he was charged money for an ET DI transaction even though he did not owe any "Early End Charges" as a result of the "Realized Value" Ally obtained from the ET DI transaction.

73.     **Adequacy:** Plaintiff will fairly and adequately represent and protect the interests of the Classes as required by Federal Rule of Civil Procedure Rule 23(a)(4).  Plaintiff is an adequate representative of the Classes because he does not have any interests which are adverse to the interests of the members of the Classes.  Plaintiff is committed to the vigorous prosecution of this action and, to that end, Plaintiff has retained counsel who are competent and experienced in handling class action litigation on behalf of consumers.

74.     Plaintiff's interests are co-extensive with, and not antagonistic to, those of the absent members of the Classes.  Plaintiff will undertake to represent and protect the interests of the absent members of the Classes.

75.     Plaintiff has engaged the services of the undersigned counsel.   Counsel is experienced in complex consumer class action litigation, will adequately prosecute this action, and will assert and protect the rights of, and otherwise represent, Plaintiff and the absent members of the Classes.

76.     **Superiority**: A class action is superior to all other available methods for the fair and efficient adjudication of the claims asserted in this action under Rule 23(b)(3) of the Federal Rules of Civil Procedure because: (a) the expense and burden of individual litigation make it economically unfeasible for members of the Classes to seek redress of their claims other than through the procedure of a class action; (b) if separate actions were brought by individual members of the Classes, the resulting duplicity of lawsuits would risk inconsistent results; and (c) absent a class action, Ally will likely retain the benefits of its wrongdoing, resulting in a failure of justice.

77.     **Predominance:** Class action status is warranted under Rule 23(b)(3) of the Federal Rules of Civil Procedure because questions of law or fact common to the members of the Classes predominate over any questions affecting only individual members.  The interests of the members of the Classes in individually controlling the prosecution of separate actions are theoretical and not practical.  Prosecution of this action through a Class Representative would be superior to individual lawsuits.  Plaintiff is not aware of any difficulty which will be encountered in the management of this litigation which should preclude its maintenance as a class action.

**FIRST CLAIM**
**BREACH OF CONTRACT**
**(On Behalf of Plaintiff and the Breach of Contract Class)**

78.      Plaintiff hereby repeats, realleges and incorporates by reference each and every allegation contained in paragraph 1 through 77 above as though the same were fully set forth herein.

79.      Plaintiff brings this claim on behalf of himself and the members of the Breach of Contract Class.

80.      Plaintiff and the members of the Breach of Contract Class entered into Ally's standard form SmartLease Agreements that were assigned to Ally.

81.      A true and correct copy of Plaintiff's SmartLease Agreement is attached as **Exhibit A.**

82.      The SmartLease Agreements provide, in effect, that if a lessee ends their lease prior to the last monthly period, then they will not owe any "Early End Charges" if there is a positive "Surplus" that is greater than the remaining base monthly payments owed under the lease.  (Exhibit A, § 36(a).)

83.      Ally required Plaintiff and the members of the Breach of Contract Class to end their leases through an Ally authorized dealer, which acted as Ally's agent.

84.      In breach of the SmartLease Agreement, Plaintiff and the members of the Breach of Contract Class were charged money as part of an ET DI transaction, even though they did not owe any "Early End Charges" pursuant to the terms of the SmartLease Agreement.  Specifically, the "Realized Value" for the vehicle from the ET DI transaction resulted in a positive "Surplus" that exceeded the value of the remaining base monthly payments owed under the lease, and thus, Plaintiff and the members of the Breach of Contract Class did not owe any "Early End Charges." (Exhibit A, § 36(a).)  They were nevertheless required to pay additional amounts to Ally and its agent as part of the ET DI transaction in breach of the agreement.

85.     Plaintiff and the members of the Breach of Contract Class actually performed and/or substantially complied with all of their obligations under the SmartLease Agreement, or were excused from performing such conditions.

86.     All conditions precedent, if any, to the bringing of this action have been performed, have been waived and/or have been otherwise excused.

87.     Plaintiff and the members of the Breach of Contract Class have been damaged as a result of Ally's breach of the SmartLease Agreement in an amount to be proven at trial, but which will be equal to, at a minimum, the total amount Plaintiff and the members of the Breach of Contract Class were charged as a result of the ET DI transaction plus applicable interest.

**SECOND CLAIM**
**VIOLATION OF THE FEDERAL CONSUMER LEASING ACT**
**(15 U.S.C. § 1667, *et seq.*)**
**(On Behalf of Plaintiff and the CLA Damage Class and the CLA Statutory Damages Class)**

88.     Plaintiff hereby repeats, realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 77 above as though the same were fully set forth herein.

89.     Plaintiff brings this claim on behalf of himself and the members of the CLA Damages Class and the CLA Statutory Damages Class (collectively referred to herein as the "CLA Classes").

90.     Plaintiff and the members of the CLA Classes entered into Ally's standard form SmartLease Agreements that were assigned to Ally.

91.     Ally is a lessor under 15 U.S.C. § 1667(3), because it regularly engages in leasing, offering to lease, and/or arranging to lease under a consumer lease.

92.     Ally's SmartLease Agreements are governed by the disclosure requirements of the CLA (15 U.S.C. § 1667a) and Regulation M (12 C.F.R. § 213.4).

93.     These disclosure requirements required Ally to fully and accurately disclose the conditions under which the lessee may terminate the lease prior to the end of the lease term, and the amount or a description of the method for determining the amount of any penalty or other charge for early termination, which must be reasonable.  (15 U.S.C. § 1667a(11); 12 C.F.R. § 213.4(g)(1).)

94.     Ally violated 15 U.S.C. § 1667a and 12 C.F.R. § 213.4 by:

a.      Deceptively representing that lessees could obtain an independent appraisal that would be used to calculate the "Early End Charges" applicable for an early termination of the lease, even though no such option was available in practice;

b.      Failing to disclose that lessees would be required to exercise their early termination options through a third-party dealer, rather than directly with Ally as represented in the SmartLease Agreement;

c.      Failing to disclose the ET DI conditions for terminating a lease prior to the end of a lease term; and

d.      Failing to disclose that Plaintiff and the Members of the CLA Classes would be charged additional fees as part of an ET DI transaction, even though they did not owe any "Early End Charges" under the terms of the SmartLease Agreement.

95.     These omissions were material to Plaintiff and the members of the CLA Classes, including their decisions to enter into the SmartLease Agreement and their decisions to end the lease early through an ET DI transaction.  If the full information had been properly disclosed, Plaintiff and the members of the CLA Classes would have, *inter alia,* known that they should not be charged any additional amounts in connection with an ET DI transaction and would not have paid such amounts.

96.     Ally's violation of 15 U.S.C. § 1667a and 12 C.F.R. § 213.4 was the actual and proximate cause of damages suffered by Plaintiff and the members of the CLA Damage Class, in an amount to be determined at trial, but which will be equal to, at a minimum, the total amount Plaintiff and the members of the CLA Damages Class were charged as a result of the ET DI transaction plus applicable interest.

97.     Pursuant to 15 U.S.C. § 1640, Plaintiff and the members of the CLA Statutory Damages Class are also entitled to recover statutory damages of $1,000,000.00 for the aforementioned violations of the CLA.  (15 U.S.C. § 1640(a)(2)(B).)

### THIRD CLAIM
### VIOLATION OF THE FLORIDA MOTOR VEHICLE LEASE DISCLOSURE ACT
### (FLA. STAT. § 521.001 *et seq.*)
### (On Behalf of Plaintiff and the FMVLDA Damages Class and FMVLDA Penalty Class)

98.     Plaintiff hereby repeats, realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 77 above as though the same were fully set forth herein.

99.     Plaintiff brings this claim on behalf of himself and the members of the FMVLDA Damages Class and the FMVLDA Penalty Class (collectively referred to herein as the "FMVLDA Classes").

100.     Plaintiff and the members of the FMVLDA Classes entered into Ally's standard form SmartLease Agreements that were assigned to Ally in the State of Florida.

101.     Ally is a retail lessor under Fla. Stat. § 521.003(8) because it regularly engages in the business of leasing motor vehicles and/or offers or arranges a lease agreement for a motor vehicle.

102.     Any Ally SmartLease Agreement which was entered in the State of Florida is governed by the disclosure requirements of Fla. Stat. § 521.004.

103.     These disclosure requirements required Ally's SmartLease Agreement to include

the "descriptions and disclosures set forth and required by the federal Consumer Leasing Act, 15

U.S.C.1667 *et seq.*" (the "CLA").  (Fla. Stat. § 521.004(1).)  The CLA, in turn, required Ally to

fully and accurately disclose the conditions under which the lessee may terminate the lease prior

to the end of the lease term, and the amount or a description of the method for determining the

amount of any penalty or other charge for early termination, which must be reasonable.  (15 U.S.C.

§ 1667a(11); 12 C.F.R. § 213.4(g)(1).)

104.     Ally violated Fla. Stat. § 521.004 by:

a.     Deceptively representing that lessees could obtain an independent appraisal

that would be used to calculate the "Early End Charges" applicable for an early termination of the

lease, even though no such option was available in practice;

b.     Failing to disclose that lessees would be required to exercise their early

termination options through a third-party dealer, rather than directly with Ally as represented in

the SmartLease Agreement;

c.     Failing to disclose the ET DI conditions for terminating a lease prior to the

end of a lease term; and

d.     Failing to disclose that Plaintiff and the Members of the FMVLDA Classes

would be charged additional fees as part of an ET DI transaction, even though they did not owe

any "Early End Charges" under the terms of the SmartLease Agreement.

105.     These omissions were material to Plaintiff and the members of the FMVLDA

Classes, including their decisions to enter into the SmartLease Agreement and their decisions to

end the lease early through an ET DI transaction.  If the full information had been properly

disclosed, Plaintiff and the members of the CLA Classes would have, *inter alia,* known that they

should not be charged any additional amounts in connection with an ET DI transaction and would not have paid such amounts.

106.     Pursuant to Fla. Stat. § 521.006(1), a lessor who fails to comply with the requirements of the FMVLDA shall be liable to the lessee for "actual damages sustained, a civil penalty of up to $1,000 per lease transaction, and reasonable attorney fees and costs."

107.     Ally's violation of Fla. Stat. § 521.004 was the actual and proximate cause of damages suffered by Plaintiff and the members of the FMVLDA Damage Class, in an amount to be determined at trial, but which will equal, at a minimum, the total amount Plaintiff and the members of the FMVLDA Damages Class were charged as a result of the ET DI transaction plus applicable interest.

108.     Plaintiff and the members of the FMVLDA Penalty Class are also entitled to recover civil penalties in the amount of $1,000 per lease transaction.  (Fla. Stat. § 521.006(1).)

## FOURTH CLAIM
### VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
### (Fla. Stat. § 501.201 *et. seq.*)
### (On Behalf of Plaintiff and the FDUTPA Damages Class
### and FDUTPA Injunctive Relief Class)

109.     Plaintiff hereby repeats, realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 77 and 88 through 108 above as though the same were fully set forth herein.

110.     Plaintiff brings this claim on behalf of himself and the members of the FDUTPA Damages Class and the FDUTPA Injunctive Relief Class (collectively referred to herein as the "FDUTPA Classes").

111.     FDUTPA prohibits any "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." (Fla. Stat. § 501.204(1).)

112.     Plaintiff and the members of the FDUTPA Classes are "consumers" as that term is defined under FDUTPA.  (Fla. Stat. §501.203(7).)

113.     Ally is engaged in a "trade or business" as that term is defined under FDUTPA. (Fla. Stat. §501.203(8).)

114.     Plaintiff and the members of the FDUTPA Classes entered into Ally's standard form SmartLease Agreements that were assigned to Ally in the State of Florida.

115.     Pursuant to Fla. Stat. § 501.203(3)(c), a *per se* violation of FDUTPA may be founded on the violation of "[a]ny law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition or unfair, deceptive or unconscionable acts or practices."

116.     Ally's failure to fully and accurately disclose the conditions under which the lessee may terminate the lease prior to the end of the lease term, and the amount or a description of the method for determining the amount of any penalty or other charge for early termination, constitutes a violation of the CLA and FMVLDA.  This, in turn, constitutes a *per se* violation of FDUTPA and an unfair and deceptive trade practice in violation of Fla. Stat. §§ 501.203(3)(a) - (c) and 501.204.

117.     In addition, Ally's company policy prohibiting lessees from transferring their right to purchase the vehicle at the "Purchase Option" price constitutes an unfair and deceptive trade practice in violation of Fla. Stat. §§ 501.203(3)(a) - (c) and 501.204.

118.     While the SmartLease Agreement provides that the lessee cannot transfer any right or interest under the lease without Ally's prior written consent, the SmartLease Agreement does not provide any standards for how Ally will exercise its discretion to consent to such transfers. (Exhibit A, § 45.)  As a result, pursuant to Florida's implied covenant of good faith and fair dealing, when one party has the power to make a discretionary decision without defined standards, such

consent must be exercised pursuant to the contracting parties' reasonable commercial expectations." (*See, e.g., Speedway SuperAmerica, LLC v. Tropic Enterprises, Inc.*, 966 So. 2d 1, 3-4 (Fla. 2d. DCA 2007).)

119.     There is no reasonable basis for Ally to systemically and categorically refuse to allow lessees to transfer their rights to purchase the vehicle at the "Purchase Option" price, given that Ally will fully recover everything owed to Ally under the lease agreement.  This is an unreasonable and unfair business practice that is not in compliance with the parties' reasonable commercial expectations.  It is solely designed to enable Ally to obtain a higher ET DI price from the dealer at the expense of its lessees.

120.     The above-described acts of Ally offend the established public policy of the State of Florida and are illegal, immoral, unethical, oppressive, unscrupulous and substantially injurious to Plaintiffs.

121.     "The remedies of [FDUTPA] are in addition to the remedies otherwise available for the same conduct under state or local law."  (Fla. Stat. § 501.213(1).)

122.     As a direct and proximate result of Ally's deceptive and unfair trade practices, Plaintiff and the members of the FDUTPA Damages Class have been aggrieved and have suffered actual damages including, but not limited to, the amounts they were required to pay as part of the ET DI transaction, plus applicable interest.

123.     Plaintiff, on behalf of himself and the members of the FDUTPA Injunctive Relief Class, is seeking an injunction requiring Ally to:

　　　　a.     Fully disclose the ET DI process in its SmartLease Agreement and that the lessee should not be charged any money by Ally or the dealer in such a transaction;

     b.       Implement procedures to allow lessees to exercise the independent appraisal option offered in the SmartLease Agreement; and

     c.       Permit lessees to transfer their right to purchase the vehicle at the "Purchase Option" price, so that lessees may directly sell the leased vehicle to the dealer while simultaneously ensuring that Ally will receive the full amount it is entitled to under the lease.

124.     Irreparable injury to Plaintiff and the members of the FDUTPA Injunctive Relief Class are presumed and need not be demonstrated to obtain injunctive relief pursuant to Fla. Stat. § 501.211(1).  In the alternative, irreparable harm to Plaintiff and the members of the FDUTPA Injunctive Relief Class has occurred and/or will occur if Ally is not enjoined from continuing to engage in the unconscionable, deceptive or unfair acts or practices alleged herein.

125.     An inadequate remedy at law is either presumed or need not be demonstrated to obtain injunctive relief pursuant to Fla. Stat. § 501.211(1).  In the alternative, Plaintiff and the members of the FDUTPA Injunctive Relief Class have no adequate remedy at law if Ally is not enjoined from continuing to engage in the unconscionable, deceptive or unfair acts or practices alleged herein.

126.     Plaintiff and the members of the FDUTPA Injunctive Relief Class have a clear right to injunctive relief pursuant to Fla. Stat. § 501.211(1).

127.     Granting injunctive relief to Plaintiff and the members of the FDUTPA Injunctive Relief Class pursuant to Fla. Stat. § 501.211(1) will serve the public interest.

128.     Plaintiff has retained the services of the undersigned counsel to represent him in this matter and has agreed to pay counsel a reasonable fee for their services for which Ally is liable pursuant to Fla. Stat. §§ 501.2105 and/or 501.211.

129.     Reasonable attorney fees and reimbursement of all costs for the prosecution of this action are requested based upon the creation of a common fund recovery and based upon the foregoing statutes.

130.     Accordingly, Plaintiff and the members of the FDUTPA Classes demand judgment against Ally for actual damages, interest, cost and attorney fees pursuant to creation of a common fund recovery and/or Fla. Stat. §§ 501.2105 and/or 501.211, and the injunctive relief requested above, and any other relief the Court deems just and proper.

### FIFTH CLAIM
### DECLARATORY RELIEF
**(On Behalf of all Plaintiff and the Class and Subclasses)**

131.     Plaintiff hereby repeats, realleges and incorporates by reference each and every allegation contained above as though the same were fully set forth herein.

132.     There exists a present controversy between the Parties as to whether Ally and its agents are permitted to charge lessees for entering into an ET DI transaction, when the lessee would not owe any "Early End Charges" as a result of the ET DI transaction under the terms of the SmartLease Agreement.

133.     Plaintiff and the Class contend that Ally and its agents are not permitted to impose any charges in those circumstances.

134.     Accordingly, Plaintiff and the members of the Classes and Subclasses hereby request the Court issue an order declaring that Ally and its agents are not permitted to charge lessees for entering into an ET DI transaction, when the lessee would not owe any "Early End Charges" as a result of the ET DI transaction under the terms of the SmartLease Agreement.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court enter a judgment against Ally in favor of Plaintiff and the members of the Classes and award the following relief:

1.  An order certifying this lawsuit as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiff as the representative of the Classes, and appointing Plaintiff's counsel as Class Counsel for the Classes;

2.  An order requiring Ally to:

    a.  Fully disclose the ET DI process in its SmartLease Agreement and that the lessee should not be charged any money by Ally or the dealer in such a transaction;

    b.  Implement procedures to allow lessees to exercise the independent appraisal option offered in the SmartLease Agreement; and

    c.  Permit lessees to transfer their right to purchase the vehicle at the "Purchase Option" price, so that lessees may directly sell the leased vehicle to the dealer while simultaneously ensuring that Ally will receive the full amount it is entitled to under the lease;

3.  An award to Plaintiff and the Classes of all appropriate relief, including actual damages;

4.  An award of all costs for prosecuting the litigation, including expert fees;

5.  An award of pre- and post-judgment interest;

6.  An award of reasonable attorney fees; and

7.  An order granting any such additional relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury as to all claims in this action.

Dated:  February 24, 2021        Respectfully submitted,

WEISS HANDLER & CORNWELL, P.A.
2255 Glades Road, Suite 205-East
Boca Raton, FL 33431
Telephone: (561) 997-9995
Facsimile: (561) 997-5280

By: s/William J. Cornwell
WILLIAM J. CORNWELL, ESQ.
FL Bar. No. 782017
wjc@whcfla.com
filings@whcfla.com
bo@whcfla.com

and

FRANK SIMS & STOLPER LLP
19800 MacArthur Blvd., Suite 855
Irvine, CA 92612
Telephone: (949) 201-2400
Facsimile: (949) 201-2405

By: s/ Jason M. Frank
JASON M. FRANK
CA Bar No. 190957 (*Pro Hac To Be Filed*)
jfrank@lawfss.com
SCOTT H. SIMS
CA Bar No. 234148 (*Pro Hac To Be Filed*)
ssims@lawfss.com

*Attorneys for Plaintiff*

# Exhibit A

**ally SMARTLEASE**

DEAL # 90680
CUST # 1130939

| Lessee (and Co-Lessee) ("You") | | Lessor |
|---|---|---|
| **Name and address, including county**<br>ISAAC M MARCUSHAMER<br><br>MIAMI-DADE | **Garaging address (if different)**<br>N/A<br><br>**Principal driver (if business use)**<br>N/A | NAPLETONS NORTH PALM AUTOPARK<br>3701 NORTHLAKE BLVD<br>LAKE PARK, FL 33403 |

This is an agreement to lease a vehicle. This is not a purchase agreement. You are not buying the vehicle. By signing this lease, you agree to everything in it.

"We," "us," and "our" refer to Lessor named above and any assignee. An "assignee" is a person to whom this lease is assigned (if it is assigned) Ally helped to arrange this lease (strike if inapplicable). Unless otherwise indicated below, Lessor will assign this lease and sell the vehicle to Ally Bank Lease Trust (Assignee).

☒ If this box is checked, Lessor will assign this lease and sell the vehicle to ALLY FINANCIAL _____ (Assignee).

☐ If this box is checked, Lessor intends not to assign this lease.

**Monthly Payment Lease.** If your payment schedule shows monthly scheduled payments (Section 2(a)), your lease is a monthly payment lease.
**Single Payment Lease.** If your payment schedule shows a single scheduled payment (Section 2(b)), your lease is a single payment lease.

## The Vehicle You Are Leasing

| New/Used | Year | Make & Model | Body Style | Vehicle ID # | Mileage | Primary Use: Personal, unless otherwise indicated below |
|---|---|---|---|---|---|---|
| NEW | 2017 | CHRYSLER PACIFICA | VN | 2C4RC1GG3HR670344 | 200 | ☐ Commercial, Business, or Agricultural |
| **Dealer Installed Options** N/A | | | | | GVW (if truck) N/A | ☐ Public Conveyance |

## Federal Consumer Leasing Act Disclosures

| 1. Amount Due at Lease Signing or Delivery (Itemized Below)* | 2(a). Monthly Scheduled Payments<br>Your first monthly payment of $ 495.87 is due on 05/13/2017 followed by 41 payments of $ 495.87 due on the 13th of each month. The total of your monthly payments is $ 20826.54 | 3. Other Charges (not part of your scheduled payment)<br>Disposition fee (if you do not purchase the vehicle and we do not waive the fee under Section 14)  $ N/A<br>N/A  $ N/A | 4. Total of Payments (The amount you will have paid by the end of the lease.) |
|---|---|---|---|
| $ 4314.22 | 2(b). Single Scheduled Payment<br>Your single payment of $ N/A is due on N/A . This is the last of your scheduled payments. | Total $ N/A | $ 24644.89 |

**\* Itemization of Amount Due at Lease Signing or Delivery**

**5. Amount Due at Lease Signing or Delivery:**

| | | |
|---|---|---|
| a. Capitalized cost reduction . . . . . . . . . . | $ | 3250.00 |
| b. First monthly payment . . . . . . . . . . . . . | $ | 495.87 |
| c. Single scheduled payment * . . . . . . . . . | $ | N/A |
| d. Refundable security deposit . . . . . . . . . | $ | N/A |
| e. Title fees . . . . . . . . . . . . . . . . . . . . . . . | $ | N/A |
| f. Registration fees . . . . . . . . . . . . . . . . . | $ | 115.40 |
| g. Sales/use tax . . . . . . . . . . . . . . . . . . . | $ | 227.50 |
| h. N/A | $ | N/A |
| i. Battery Fee Upfront 1.50/ Tire Fee 5.00 | $ | 6.50 |
| j. Rental Surcharge | $ | 60.00 |
| k. Priv-Tag-Agency | $ | 89.00 |
| l. N/A | $ | 69.95 |
| m.Total . . . . . . . . . | $ | 4314.22 |

**6. How the Amount Due at Lease Signing or Delivery will be paid:**

| | | |
|---|---|---|
| a. Net trade-in allowance . . . . . . . . . . . . . | $ | N/A |
| b. Rebates and noncash credits . . . . . . . . . | $ | 3250.00 |
| c. Amount to be paid in cash . . . . . . . . . . . | $ | 1064.22 |
| d. Total | $ | 4314.22 |

(e) means estimate

**7. Your scheduled payment is determined as shown below:**

| | | |
|---|---|---|
| a. Gross capitalized cost. The agreed upon value of the vehicle ($ 43862.11 ) and any items you pay for over the lease term (such as service contracts, insurance, and any outstanding prior credit or lease balance) . . . . . . . . . . . . . . . | $ | 44961.57 |
| b. Capitalized cost reduction. The amount of any net trade-in allowance, rebate, noncash credit, or cash you pay that reduces the gross capitalized cost . . . . . . . . . . . . . . . | - $ | 3250.00 |
| c. Adjusted capitalized cost. The amount used in calculating your base scheduled payment . . . . . . . . . . . . . . . . . . . . . | = $ | 41711.57 |
| d. Residual value. The value of the vehicle at the end of the lease used in calculating your base scheduled payment . . . . | - $ | 22303.85 |
| e. Depreciation and any amortized amounts. The amount charged for the vehicle's decline in value through normal use and for other items paid over the lease term . . . . . . . . . . . . . . . | = $ | 19407.72 |
| f. Rent charge. The amount charged in addition to the depreciation and any amortized amounts . . . . . . . . . . . . . . . | + $ | 56.34 |
| g. Total of base scheduled payment(s). The depreciation and any amortized amounts plus the rent charge . . . . . . . . . . | = $ | 19464.06 |
| h. Lease payments. The number of payments in your lease . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | ÷ | 42 |
| i. Base scheduled payment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | = $ | 463.43 |
| j. Sales/use tax (estimated) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | + $ | 32.44 |
| k. N/A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | + $ | N/A |
| l. Total scheduled payment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | = $ | 495.87 |

> **Early Termination.** You may have to pay a substantial charge if you end this lease early. The charge may be up to several thousand dollars. The actual charge will depend on when the lease is terminated. The earlier you end the lease, the greater this charge is likely to be.

| | |
|---|---|
| 8. Excessive Wear and Use. You may be charged for excessive wear based on our standards for normal use and for mileage in excess of 10,000 miles per year at the rate of $ 0.20 per mile. | |
| 9. Purchase Option at End of Lease Term. You have an option to buy the vehicle at the end of the lease term for $ 22303.85 plus official fees and taxes. | |

10. **Other Important Terms.** See your lease documents for additional information on early termination, purchase options and maintenance responsibilities, warranties, late and default charges, and insurance.

### Insurance Notice
The valid and collectible insurance and personal injury protection insurance of any authorized rental or leasing driver is primary for the limits of liability and personal injury protection coverage required by sections 324.021(7) and 627.736, Florida Statutes.

75221*1*AP-FI                08/28/2020  03:34 pm

**SEE THE OTHER PAGES OF THIS LEASE FOR OTHER IMPORTANT AGREEMENTS INCLUDING A PROHIBITION OF TRANSFER OF YOUR INTEREST.**

COPY

Lease Agreement 10 AF-671-FL-e 5/19                Page 1 of 5                Lessee's Initials: _____ / Co-Lessee's Initials: N/A

b. Ally administrative fee...................... + $ ___ N/A

c. License/registration/title fees ............. + $ ___ N/A

   i. License fees ............... $ ___ N/A

   ii. Registration fees ............ $ ___ • N/A

   iii. Title fees ................... $ ___ N/A

d. Sales tax ............................. + $ ___ 0.46

e. Other tax (describe) _N/A_ ............ + $ ___ N/A

f. Optional service contract ............... + $ ___ N/A

g. Optional maintenance contract........... + $ ___ 1.00

h. Optional life insurance .................. + $ ___ •

i. Optional disability insurance ............ + $ ___ N/A

j. Dealer predelivery service charge **...... + $ ___ 1098.00

   i. Predelivery service fee .......... $ ___ 1098.00

   ii. Electronic title/registration filing fee. $ ___ N/A

   iii. _N/A_ ........................... $ ___ N/A

\*\* This charge represents costs and profit to the dealer for items such as inspecting, cleaning, and adjusting vehicles, and preparing documents related to the sale.

k. _N/A_ _____ ...... + $ ___ N/A

l. _N/A_ _____ ...... + $ ___ N/A

m. _N/A_ _____ ...... + $ ___ N/A

n. _N/A_ _____ ...... + $ ___ N/A

o. _N/A_ _____ ...... + $ ___ N/A

p. Gross Capitalized Cost...... + $ ___ 44961.57

**12. The Vehicle You Are Trading.** _____ N/A

                    (year) (make) (model)

Gross trade-in value..................... $ ___ N/A

Payoff.................................. – $ ___ N/A

Net trade-in value ....................... = $ ___ N/A

**13. Official Fees and Taxes.** You will pay all government license, title, registration, testing, and inspection fees for the vehicle. You will pay all taxes on the lease, payments due under the lease, or the vehicle that the government levies on you, the vehicle, or us (except our net income taxes). We may change your monthly payment if taxes change. We may bill you separately for official fees and taxes.

Estimated Total Official Fees and Taxes You
Must Pay During Lease.       $ ___ 1703.84

The actual total of official fees and taxes may be higher or lower depending on tax rates in effect or the vehicle value when a tax or tax is assessed.

---

or installment sale contract that the dealer assigns to Ally.

**15. Lease Term:** ___ 42 months.

**16. Total Allowed Mileage.** The total mileage allowed on the odometer at lease end is ___ 35,200 miles.

**Extra Miles.** The total allowed mileage includes ___ N/A extra miles that you are buying at $ ___ N/A per mile. If this lease ends on or after the start of the next-to-last monthly period, we will give you a credit for each unused extra mile you bought. There will be no credit if the lease ends earlier, you buy the vehicle, or the vehicle is a total loss.

**17. Required Vehicle Insurance Information.** You affirm that liability and physical damage policies that meet our requirements (see Section 23) are in force on the date of this lease as follows:

Insurance company name: __STATE FARM__

Insurance agency name: __DIRECT AGENT__

Agency address: ___ N/A

Agency phone no.: __877-627-5757__

Agent's name: ___ DIRECT AGENT

Policy no.: ▮▮▮▮▮▮▮▮

Deductibles: Collision $ ___ 500.00   Comprehensive $ ___ 500.00

**18. WARRANTY AND EXCLUSION OF WARRANTY.** You have the benefit of the standard manufacturer's warranty unless this box is checked. ☐

☐ If this box is checked, you have the benefit of the following warranty:

Warranty papers that are separate from this lease state any coverage limits. The law gives you a warranty that the vehicle conforms to the description in this lease. THERE ARE NO OTHER EXPRESS WARRANTIES ON THE VEHICLE.

Unless Lessor makes a written warranty or enters into a service contract within 90 days from the date of this lease, LESSOR MAKES NO IMPLIED WARRANTY OF MERCHANTABILITY, AND THERE IS NO IMPLIED WARRANTY THAT THE VEHICLE IS FIT FOR A PARTICULAR PURPOSE. If Lessor makes a written warranty or enters into a service contract within 90 days from the date of this lease, then any implied warranty of merchantability and any warranty that the vehicle is fit for a particular purpose are limited in duration to the longer of the term of the written warranty or the term of the service contract.

---

**19. Optional Insurance, Service Contracts, and Maintenance Agreements.** We do not require any of the insurance, products, or services listed in this section. Your decision to buy them or not buy them is not a factor in our decision to approve this lease. We will try to get any optional insurance coverage(s) that you initial below. A notice you receive when you sign this lease describes the coverage(s) in greater detail. Life insurance and disability insurance may not cover taxes and other amounts due besides the base monthly payment.

You are not required to buy a service contract or maintenance agreement as part of this lease. Your choice of providers for any service contract or maintenance agreement you buy will not affect our decision to lease to you.

| Optional Insurance | Coverage | Charge or Premium | Provider | By initialing below, you indicate you want the insurance |
|---|---|---|---|---|
| Life Insurance (Monthly Payment Lease Only) | N/A Lessee   N/A Co-Lessee<br>Coverage is for lease term<br>Coverage limit  $ ___ N/A | • <br>$ ___ N/A | N/A | Lessee/Co-Lessee initials<br>N/A / N/A |
| Disability Insurance (Monthly Payment Lease Only) | Lessee<br>Coverage is for lease term<br>Monthly Coverage limit  $ ___ N/A | $ ___ N/A | N/A | Lessee/Co-Lessee initials<br>N/A / N/A |
| N/A | N/A Months ___ N/A Miles<br>Coverage limit  $ ___ N/A | $ ___ N/A | N/A | Lessee/Co-Lessee initials<br>N/A / N/A |

| Other Optional Product or Service | | Term | | |
|---|---|---|---|---|
| NAPLETON ADVANTAGE | | 12 Months, N/A Miles | | |
| N/A | | N/A Months, N/A Miles | | |

---

75221*1*AP-FI            08/28/2020  03:34 pm

• COPY •

22. Excess mileage charge (Section 36(c)). If there is any Excess Mileage Charge (Section 36(c)) and Section 10 for the total allowed mileage. If the lease ends before the start of the last monthly period and the vehicle is not a total loss, any Early Excess Mileage and Wear Charge (Section 36(c)) will not exceed the Residual Value (Section 7(d)) minus the Realized Value (Section 36(b)). If the vehicle is a total loss before the scheduled lease end date, any excess mileage charge will not exceed the applicable limitation specified in Section 39 (Monthly Payment Lease) or Section 40 (Single Payment Lease). There is no excess mileage charge if you buy the vehicle.

21. Late Charge. If we do not receive a full monthly payment within 10 days after it is due, you will pay a late charge of 5% of the part of the payment that is late.

22. Charge for Fines and Other Items. You will pay promptly any fine, parking ticket, toll charge, toll penalty charge, moving violation fine, or similar charge relating to the vehicle. If you do not, we may pay it. Each time we pay any such fine or charge, you will pay us the amount we pay plus $10. If we pay to remove a lien on the vehicle that you did not agree to, you will pay us the amount we pay.

## Insurance, Use, and Care of the Vehicle

23. Required Vehicle Insurance. You must insure the vehicle through liability and physical damage policies acceptable to us. The insurance we require is not included in the lease. You may choose the insurer, but we have the right to reject that insurer for reasonable cause. The policies must not exclude or restrict coverage if you were to drive the vehicle, or when the driver is someone you allow to drive the vehicle or who is likely to drive the vehicle. The policies must show any additional insureds and loss payees that we require. You must give us proof of insurance when we ask. We require no other insurance.

Liability insurance must (a) cover at least $10,000 for property damage, $10,000 for bodily injuries to any one person, and $20,000 for bodily injuries for any one accident, or (b) have a combined single limit of at least $250,000 for bodily injuries and property damage for any one accident.

For trucks of 10,000 lbs. GVW or more and public conveyance vehicles, liability insurance must instead (a) provide primary coverage of at least $50,000 for property damage, $100,000 for bodily injuries to any one person, and $300,000 for bodily injuries for any one accident, and umbrella coverage of $1,000,000 or (b) have a combined single limit of at least $1,000,000 for bodily injuries and property damage for any one accident.

Physical damage insurance must be for the full value of the vehicle with deductibles of no more than $1,000 for collision and upset loss and $1,000 for comprehensive fire and theft loss.

If you move to a new state, we will require coverage amounts in keeping with our requirements. The law may require you to maintain greater insurance coverage than this lease requires.

### Insurance Notice

**The valid and collectible insurance and personal injury protection insurance of any authorized rental or leasing driver is primary for the limits of liability and personal injury protection coverage required by sections 324.021(7) and 627.736, Florida Statutes.**

24. Use. You will not:
— Use the vehicle illegally, improperly, or for hire.
— Use the vehicle in a way that causes the insurance coverage on the vehicle to be ineffective.
— Remove the vehicle from the United States, except for trips to Canada of under 60 days,
— Move the vehicle to another state for more than 30 days without telling us.
— Change the vehicle without our written consent.
— Replace parts, accessories, or tires with rented or leased items.
— Expose the vehicle to seizure, confiscation, forfeiture, or other involuntary transfer.
— Allow a lien to be placed on the vehicle unless we agree.

You will not let anyone else do any of these things.

25. Maintenance, Repairs, Operating Expenses, and Damage. You will maintain and repair the vehicle to keep it in good condition. Replacement sheet metal must be new original equipment manufacturer parts. Other replacement parts must be original equipment manufacturer parts or parts of equal quality and design. (If insurance will pay for repairs, ask your insurance company to specify original equipment manufacturer sheet metal.) You will pay all maintenance, repair, and operating expenses, including gas and oil. If the odometer stops working, you must fix it immediately. You will service the vehicle as the manufacturer recommends. You will follow the manufacturer's instructions in any recall. If you don't do these things, we may do them. You will owe us our cost if we do. We may inspect the vehicle at any reasonable time and place.

When you take possession of the vehicle, you take on the risks of loss of the vehicle and of damage to it. If the vehicle is damaged, stolen, or destroyed and money becomes available from insurance, a judgment, a settlement, or the like, we will treat the money as an insurance settlement. We and/or any agent we designate to hold title for our benefit on the vehicle's certificate of title and/or registration, such as Vehicle Asset Universal Leasing Trust, will be entitled to this money. If the lease ends in connection with our receipt of the money, we will treat any money we do not use to repair the vehicle as sale proceeds.

26. Excess Wear. Excess wear is wear that is beyond the minor wear reasonably expected to result from ordinary, everyday use, assuming that you use the vehicle as this lease permits (see Section 24) and maintain it as this lease requires (see Section 25). Excess wear includes: (a) glass that is damaged, engraved, or that you tinted; (b) a damaged or corroded body, trim, frame, crossmember, suspension, engine, powertrain, or other mechanical part; (c) damaged paint; (d) a torn, damaged, or stained interior or trunkliner; (e) sheet metal that is not original equipment sheet metal; (f) missing equipment or parts that were in or on the vehicle when delivered and not replaced with equipment or parts of equal quality and design (including a missing wheel, wheel cover, jack, or wheel wrench); (g) a tire (including spare) that is unsafe, is not the size and type the manufacturer recommends, is recapped or a snow tire, or has less than 1/8 inch of tread left at the shallowest point; (h) a damaged or worn brake that does not meet government safety standards; (i) oil leaks or low oil pressure; (j) a malfunctioning electrical system, battery, or lights; (k) holes that you drilled in the vehicle; (l) any change to the vehicle that damages the vehicle or compromises its structural integrity; (m) any other condition that makes the vehicle run in a noisy, rough, improper, unsafe, or unlawful way; and (n) any other damage, whether or not insurance covers it.

## When the Lease Can End

27. Scheduled End.

Monthly Payment Lease - This lease is scheduled to end on the date that is determined as follows: (1) Start with the date on which the second payment is due (even if that date is not an actual calendar date because the month has too few days) (See Section 2(a)); (2) Move that date forward by the number of months in the lease term (Section 15), minus one month; and (3) Subtract one day. If the resulting date is not an actual calendar date (because the month has too few days), the scheduled lease end date is the last actual date in that month minus one day.

Single Payment Lease - This lease is scheduled to end on the date that is determined as follows: (1) Start with the date of the lease; (2) Move that date forward by the number of months in the lease term (Section 15); and (3) Subtract one day. If the resulting date is not an actual calendar date (because the month has too few days), the scheduled lease end date is the last actual date in that month minus one day.

28. Lease End Daily Extension. At scheduled lease end, if you keep the vehicle and do not buy it at that time, you elect to extend the lease. This extension does not change the scheduled lease end date. You will pay a daily extension charge beginning on the eighth day after the scheduled lease end date and ending when you return the vehicle. The charge per day is the greater of: (1) 0.0017 times the Residual Value (Section 7(d)); or (2) $25. Unless we agree to a longer extension, you may not extend the lease for more than 30 days. We may set a shorter limit. During the daily extension period, you agree to comply with the terms of this lease, other than terms that apply to monthly payments and early end. The total allowed mileage (Section 16) will not increase.

29. Early End. You may end this lease anytime. We may end this lease if you are in default or if the vehicle is a total loss.

30. Default. You will be in default if any of these things happens:
— You do not pay on time.
— You made a material misrepresentation when you applied for this lease.
— You start a bankruptcy, receivership, or insolvency proceeding or one is started against you or your property.
— You break any other agreements in this lease.
— You do anything the law says is a default (see Section 38).

If you are in default, we may end this lease and exercise our rights under default (see Section 38).

## At Lease End

31. Vehicle Return. Unless you buy the vehicle, you will return the vehicle (including any dealer-installed options you do not buy outright) at lease end to any reasonable place we tell you. After you return the vehicle, you will call us promptly and tell us where you returned the vehicle.

32. Option to Buy the Vehicle. You have an option to buy the vehicle. The price to buy the vehicle on or after the start of the last monthly period is disclosed in Section 9. The purchase option price disclosed in Section 9 is the price for which we would sell the vehicle to you after the start of the last monthly period.

If this is a monthly payment lease, the price to buy the vehicle before the start of the last monthly period is: (1) the price to buy the vehicle disclosed in Section 9, plus (2) the base monthly payment times the number of payments not yet due, minus (3) any unearned rent charge figured by the Actuarial Method (see Section 42) based on the number of full monthly periods between early end and scheduled end.

If this is a single payment lease, the price to buy the vehicle before the start of the last monthly period is: (1) the price to buy the vehicle disclosed in Section 9, plus (2) the Remaining Prepaid Depreciation (Section 37(b)). If this is a single payment lease and you buy the vehicle before the start of the last monthly period, we will give you a credit for (1) the Remaining Prepaid Depreciation (Section 37(b)), plus (2) any unearned rent charge figured by the Actuarial Method (see Section 42) based on the number of full monthly periods between early end and scheduled end.

Regardless of when you buy the vehicle, you must also pay any related official fees and taxes, plus any amounts due because you broke agreements in this lease. In connection with a transfer of vehicle ownership. You may be fined and/or

owe us nothing more.

35. **What You Owe at Scheduled End, or If You End This Lease On or After the Start of the Last Monthly Period, and You Do Not Buy the Vehicle.** You will owe us: (1) any Disposition Fee shown in Section 3 (unless waived; see Section 14), (2) any excess mileage charge (Sections 8, 16, and 20); (3) our estimated or actual cost of repairing excess wear (we do not have to make repairs); (4) any lease and daily extension charge (Section 28); and (5) any additional amounts due under Section 41. We will give you any credits due under Section 41. However, if the vehicle is a total loss before the scheduled lease date, you will owe us the amount described in Section 39 (Monthly Payment Lease) or Section 40 (Single Payment Lease).

36. **What You Owe If You End This Lease Before the Start of the Last Monthly Period, and You Do Not Buy the Vehicle - Monthly Payment Lease.**
(a) **What You Owe:** You will owe us an Early End Charge as follows:

   The base monthly payment times the number of payments not yet due,
   - Any unearned rent charge figured by the Actuarial Method (see Section 42), based on the number of full monthly periods between early end and scheduled end
   - Any Surplus (see definition in this section) on the vehicle sale
   = The total. If this total is less than zero, we will not give you a refund or credit.

If there is no Surplus, you will also owe us any Early Excess Mileage and Wear Charge (see definition in this section).

You will also owe us: (1) any Disposition Fee shown in Section 3 (unless waived; see Section 14); and (2) any additional amounts due under Section 41. We will give you any credits due under Section 41.

(b) **Definition of "Realized Value" and "Surplus":** We will sell the vehicle at wholesale. We will use the sale price of the vehicle as its Realized Value, unless you get an independent appraisal of the wholesale value of the vehicle that could be realized at sale (see below in this section). If you get such an appraisal, we will use the appraised value of the vehicle as its Realized Value. If the Realized Value exceeds Residual Value (Section 7(d)), the excess is the Surplus. If the Realized Value is the same as or less than Residual Value, there is no Surplus.

**Your Right to Obtain an Independent Appraisal of the Vehicle's Wholesale Value.** You may get a professional appraisal of the wholesale value of the vehicle that could be realized at sale. The appraiser must be an independent third party. You and we must agree on the appraiser. You must pay for the appraisal and get it within a reasonable time after lease end. The appraised value will then be used as the Realized Value.

(c) **Definition of "Early Excess Mileage and Wear Charge":** Our estimated or actual cost of any repairs the vehicle needs because of excess wear (we do not have to make repairs), plus any excess mileage charge (Sections 8, 16, and 20). This charge will not exceed the Residual Value (Section 7(d)) of the vehicle minus its Realized Value (Section 36(b)).

37. **What You Owe If You End This Lease Before the Start of the Last Monthly Period, and You Do Not Buy the Vehicle - Single Payment Lease.**
(a) **What You Owe:** The single scheduled payment due at lease signing prepays the rent charge, depreciation, and any amortized amounts.
We will give you a credit for any unearned rent charge, figured by the Actuarial Method (see Section 42) based on the number of full monthly periods between early end and scheduled end.

We will give you a credit for any Surplus (see Section 36(b)), up to the amount of the Remaining Prepaid Depreciation (see definition in this section). If the vehicle's Realized Value (Section 36(b)) is less than its Residual Value, you owe us any Early Excess Mileage and Wear Charge (Section 36(c)).

You will also owe us: (1) any Disposition Fee shown in Section 3 (unless waived, see Section 14); and (2) any additional amounts due under Section 41. We will give you any credits due under Section 41.

If the sum of the credits exceeds the sum of the amounts due, we will refund the difference to you. If the sum of the amounts due exceeds the sum of the credits, you will owe us the difference.

(b) **Definition of "Remaining Prepaid Depreciation":** The Remaining Prepaid Depreciation is:

   The base single scheduled payment
   ÷ The number of months in the lease
   × The number of full monthly periods between early end and the scheduled lease end date
   - The unearned rent charge credit

38. **Our Rights Upon Default (including What You Owe Upon Default).** If you are in default, we may:
   — End this lease and require you to pay the amount you would have owed: (1) under Section 36 (Monthly Payment Lease) or Section 37 (Single Payment Lease) if you had ended the lease before the start of the last monthly period; or (2) under Section 35 if you had ended the lease on or after the start of the last monthly period.
   — Take the vehicle from you without demand. If the law permits, we may go on your property to take the vehicle. If the vehicle has an electronic locating device, we may use the device to find the vehicle.
   — Sue you for damages and to get the vehicle back.
   — Pursue any other remedy the law gives us.

We will exercise our rights without breach of the peace, at reasonable times and places, in a reasonable way, as the law permits. We may take and store any personal items that are in the vehicle. If you do not ask for these items back, we may dispose of them as the law allows. You will pay our reasonable expenses of taking these actions as the law allows. These expenses may include expenses of taking and storing the vehicle, attorney's fees, collection costs, and court costs.

39. **Total Loss Before the Scheduled Lease End Date - Monthly Payment Lease.**

(a) **Total Loss With a Settlement Under the Required Insurance Coverage:** If the vehicle is a total loss before the scheduled lease end date, and we get an insurance settlement under a policy that complies with our requirements (Section 23), you have gap protection.

If the money we get from your insurance is more than the Unamortized Capitalized Cost (see definition in this section), we will not give you a credit for any excess.

If the money we get from your insurance is less than the Unamortized Capitalized Cost (see definition in this section), we will owe you the difference up to the amount of your insurance deductible. If the difference is more than your insurance deductible, you will also owe an excess mileage charge (Sections 8, 16, and 20), up to the amount by which the difference exceeds your deductible. We will figure the excess mileage charge as if the lease had ended as scheduled.

You will also owe us any additional amounts due under Section 41. We will give you any credits due under Section 41. There will be no credit for unused extra miles.

(b) **Total Loss Without a Settlement Under the Required Insurance Coverage:** There is no gap protection if the vehicle is a total loss before the scheduled lease end date and: (1) we do not get an insurance settlement; or (2) we get an insurance settlement under a policy that does not comply with our requirements (see Section 23). You will owe us: (1) the Unamortized Capitalized Cost (see definition in this section); minus (2) any money we get from your insurance; minus (3) if the vehicle is returned to us, its Realized Value (Section 36(b)). If the vehicle is not returned to us, the Realized Value is zero, and you will not have an independent appraisal right (Section 36(b)). If any money we get from your insurance plus the realized value exceeds the Unamortized Capitalized Cost, we will not give you a credit for any excess.

You will also owe us any additional amounts due under Section 41, plus, if the vehicle is returned to us, any Disposition Fee shown in Section 3 (unless waived; see Section 14). We will give you any credits due under Section 41.

(c) **Definition of "Unamortized Capitalized Cost":** The base monthly payment times the number of payments not yet due, minus any unearned rent charge figured by the Actuarial Method (see Section 42), based on the number of full monthly periods between early and scheduled end, plus the Residual Value (Section 7(d)).

40. **Total Loss Before the Scheduled Lease End Date - Single Payment Lease.**

(a) **Total Loss With a Settlement Under the Required Insurance Coverage:** If the vehicle is a total loss before the scheduled lease end date, and we get an insurance settlement under a policy that complies with our requirements (Section 23), you have gap protection.

We will give you a credit for any unearned rent charge, figured by the Actuarial Method (see Section 42) based on the number of full monthly periods between early end and scheduled end.

We will give you a credit for the Remaining Prepaid Depreciation (Section 37(b)).

If the money we get from your insurance is more than the sum of the Residual Value (Section 7(d)) plus the Remaining Prepaid Depreciation (Section 37(b)), we will not give you a credit for any excess.

If the money we get from your insurance is less than the sum of the Residual Value (Section 7(d)) plus the Remaining Prepaid Depreciation (Section 37(b)), we will owe the difference up to the amount of your insurance deductible. If the difference is more than your insurance deductible, you will also owe an excess mileage charge (Sections 8, 16 and 20), up to the amount by which the difference exceeds your deductible. We will figure the excess mileage charge as if the lease had ended as scheduled.

You will also owe us any additional amounts due under Section 41. We will give you any credits due under Section 41. There will be no credit for unused extra miles.

If the sum of the credits exceeds the sum of the amounts due, we will refund the difference to you. If the sum of the amounts due exceeds the sum of the credits, you will owe us the difference.

(b) **Total Loss Without a Settlement Under the Required Insurance Coverage:** There is no gap protection if the vehicle is a total loss before the scheduled lease end date and: (1) we do not get an insurance settlement; or (2) we get an insurance settlement under a policy that does not comply with our requirements (see Section 23). You will owe us: (1) the Residual Value (Section 7(d)); minus (2) any money we get from your insurance; minus (3) if the vehicle is returned to us, its Realized Value (Section 36(b)). If the vehicle is not returned to us, the Realized Value is zero, and you will not have an independent appraisal right (Section 36(b)). If any money we get from your insurance, plus the Realized Value exceeds the Residual Value, we will give you a credit for the excess, up to the amount of the Remaining Prepaid Depreciation (Section 37(b)). We will give you a credit for any unearned rent charge, figured by the Actuarial Method (see Section 42) based on the number of full monthly periods between early end and scheduled end.

You will also owe us any additional amounts due under Section 41, plus, if the vehicle is returned to us, any Disposition Fee shown in Section 3 (unless waived; see Section 14). We will give you any credits due under Section 41.

If the sum of the credits exceeds the sum of the amounts due, we will refund the difference to you. If the sum of the amounts due exceeds the sum of the credits, you will owe us the difference.

08/28/2020  03:34 pm

75221*1*AP-FI               **COPY**
Lease Agreement 10 AF-671-FL-e 5/19      Page 4 of 5             Lessee's Initials: _____ / Co-Lessee's Initials: **N/A**

41. _(text partially cut off)_ because this lease ends early, plus any amounts due because you broke agreements in this lease. We may cancel any optional insurance or service, maintenance, or other contracts that we financed for you. We will give you a credit for any amount we get from cancellations. If the lease ends on or after the start of the next-to-last monthly period and you do not buy the vehicle, we will give you a credit for any unused extra miles, unless the vehicle is a total loss (see Section 16).

**42. Actuarial Method of Figuring the Unearned Rent Charge.** We will use the Actuarial Method to figure the unearned rent charge on a monthly basis. We will treat the rent charge for each monthly period as fully earned on the period's first day. If this is a monthly payment lease, we will treat each monthly payment that you made as if we received it on its due date. We will give you a written explanation of the Actuarial Method upon request.

**43. Security Deposit.** If you paid a security deposit, we will use it at lease end to pay anything you owe under this lease and do not pay. We will not pay you interest on the security deposit. We will not add to the security deposit any proceeds, money, or funds we receive from the security deposit. After lease end, we will give back any part of the security deposit that remains.

### Additional Terms

**44. Assignment By Lessor.** If this lease is assigned, the assignee may designate another, such as Vehicle Asset Universal Leasing Trust, or its trustee, as agent to hold title for the benefit of the assignee on the vehicle's certificate of title and/or registration.

Any sale and assignment will not be considered to change materially your duties, burden, or risk under this lease. Neither the assignee nor its designee, such as Vehicle Asset Universal Leasing Trust, will have to make any repairs to the vehicle, get any insurance, or perform any service Lessor has agreed to perform under this lease. You will look only to Lessor for these services.

If we assign this lease, you will not receive notice of assignment.

**45. PROHIBITION OF TRANSFER OF YOUR INTEREST.** YOU WILL NOT SUBLEASE OR OTHERWISE TRANSFER (EXCEPT TO YOUR ESTATE) ANY RIGHT OR INTEREST YOU HAVE UNDER THIS LEASE OR IN THE VEHICLE WITHOUT OUR PRIOR WRITTEN CONSENT.

**46. Indemnity.** You will protect us from all losses, damages, injuries, claims, demands, and expenses arising out of the condition, maintenance, use, or operation of the vehicle. You agree to indemnify, and hold harmless, us and our assigns from all such losses, damages, injuries, claims, demands, and expenses.

**47. Servicing and Collection Contacts.** You agree that we may try to contact you in writing, by e-mail, or using prerecorded/artificial voice messages, text messages, and automatic telephone dialing systems, as the law allows. You agree that we may try to contact you in these and other ways at any address or telephone number you provide us, even if the telephone number is a cell phone number or the contact results in a charge to you.

**48. Records and Signatures Acknowledgment.** We may keep this lease in a paper or electronic form, regardless of how this lease was created or provided to you. We also may enforce this lease in either such form. If you signed this lease using an electronic signature, you acknowledge that your electronic signature has the same effect as your written ink signature.

---

> **THIS IS A LEASE AGREEMENT. THIS IS NOT A PURCHASE AGREEMENT. PLEASE REVIEW THESE MATTERS CAREFULLY AND SEEK INDEPENDENT PROFESSIONAL ADVICE IF YOU HAVE ANY QUESTIONS CONCERNING THIS TRANSACTION. YOU ARE ENTITLED TO AN EXACT COPY OF THE AGREEMENT YOU SIGN.**

---

### Signatures

**THIS IS THE ENTIRE AGREEMENT.** This lease contains the entire agreement between you and us relating to the lease of the vehicle. Any change to this lease must be in writing, and we must sign it. No oral changes are binding.

LESSEE: X_____ BY: X **ISAAC M MARCUSHAMER** _____ CO-LESSEE: X _____ **N/A** _____

We may delay or refrain from enforcing any of our rights under this lease without losing them.

**NOTICE TO LESSEE.   1. DO NOT SIGN THIS AGREEMENT BEFORE YOU READ IT.   2. YOU ARE ENTITLED TO A COPY OF THIS AGREEMENT.**

YOU AGREE TO THE TERMS OF THIS LEASE. YOU CONFIRM THAT BEFORE YOU SIGNED THIS LEASE, WE GAVE IT TO YOU, AND YOU WERE FREE TO TAKE IT AND REVIEW IT.

YOU CONFIRM THAT YOU SIGNED THIS AGREEMENT AND RECEIVED A COPY AT ____ **LAKE PARK, FL** ____ ON ____ **May 13th 2017** ____
                                                                     (city)          (state)              (month)   (day)   (year)

LESSEE: X_____ BY: X **ISAAC M MARCUSHAMER** _____ CO-LESSEE: X _____ **N/A** _____

Lessor agrees to the following: (1) Lessor accepts this lease. (2) If a party is identified in this lease as the intended assignee ("Intended Assignee"), Lessor (i) assigns all right, title, and interest in this lease to the Intended Assignee, under the terms of the Lease Plan Dealer Agreement in effect from time to time with the assignee (the "Dealer Agreement"), and (ii) assigns all right, title, and interest in the leased vehicle to the Intended Assignee, or its designee, under the terms of the Dealer Agreement. Lessor acknowledges that neither the Dealer Agreement nor this assignment renders Lessor an agent of the assignee.

LESSOR: _**NAPLETONS NORTH PALM AUTOPARKX**_ _____ TITLE: **FI MANAGER** _____ DATE: _05/13/2017_

---

Lease Agreement 10 AF-671-FL-e 5/19
Copyright 2019 Ally Financial. All Rights Reserved. SmartLease is a registered service mark of Ally Financial.

# Exhibit B

# APPRAISAL OFFER 

**Name:** ISAC
**Address:** ███████

**Vehicle:** 2017 CHRYSLER PACIFICA 4D PASS VAN LIMITED
**Mileage:** 29,040    **Engine:** 3.6L
**VIN:** 2C4RC1GG3HR870344
**Color:** WHITE

Contact:
ALESANDER BALLESTEROS CRUZ
7195 - MIAMI LAKES, FL
Date:
08/31/2020

## Features considered

| | |
|---|---|
| POWER LOCKS | POWER WINDOWS |
| PANORAMIC SUNROOF | SKYLIGHT(S) |
| AM/FM STEREO | AUXILIARY AUDIO INPUT |
| HARMAN KARDON SOUND | AIR CONDITIONING |
| REAR AIR CONDITIONING | REAR DEFROSTER |
| CRUISE CONTROL | ABS BRAKES |
| THIRD ROW SEAT | LEATHER SEATS |
| POWER SEAT(S) | MEMORY SEAT(S) |
| FRONT SEAT HEATERS | REAR SEAT HEATERS |
| QUAD SEATS | FOLD-AWAY MIDDLE ROW |
| AUTOMATIC TRANSMISSION | |

POWER FOLDING THIRD ROW, POWER MIRRORS, FULL ROOF RACK, NAVIGATION SYSTEM, DVD VIDEO SYSTEM, BLU-RAY VIDEO SYSTEM, ALLOY WHEELS, 20 INCH PLUS WHEELS, TRACTION CONTROL, A/C SEAT(S)

## Conditions assessed    348581

| | | | |
|---|---|---|---|
| Front Tires: | Need to Replace | Rear Tires: | Need to Replace |
| Pass Fender: | Scratches/Chips | Front Bumper: | Needs Paintwork |
| Front Seats: | Good Condition | Rear Seats: | Good Condition |
| Carpet: | Good Condition | Transmission: | Good Condition |
| Engine: | Good Condition | Wheels: | Good Condition |

## Appraisal offer    **$24,000**

This offer is valid until the close of business on 9/07/20.

**If you purchase a CarMax vehicle while selling us your vehicle,
you could be eligible for tax savings up to $1,440.00**

**This offer is good for 7 days** and will be honored at all CarMax stores.
After 7 days, your vehicle will need to be reappraised and the **offer may change.**

**Comments**
No mechanical verification needed
THANKS FOR HAVING YOUR VEHICLE APPRAISED

WARREN T
- CarMax Certified Appraiser

We've appraised more than 10 million vehicles. If you have questions about how we determined your offer, just ask!

# SELL US YOUR CAR today

## AND WALK AWAY WITH PAYMENT IN HAND

When you sell to CarMax, you can avoid the hassles of selling your car yourself:
• Costly advertising
• The uncertainties of an unknown buyer
• Inspections, negotiations, and payment

**We'll buy your car even if you don't buy ours!**

## TO SELL US YOUR VEHICLE

• Title (if it is not with a lienholder)
• Valid registration
• Valid state-issued photo ID for all titleholders
• All keys and remotes (if applicable)

# Exhibit C

# CARMAX

## CarMax Payoff Form
### Lienholder Information

Lienholder Name: _Ally Financial_                  Attention: _____

Address: _____

City: _____  State: _____  Zip: _____

Phone: _____  Ext: _____

☐  Regular Car Loan

☑  Leased Vehicle        ### Customer Account Information

Customer: _ISAAC M. MARCUSHAMER_              SSN: _051_ - _94_ - _0177_

Customer: _____              SSN: ___ - ___ - ___

Account #: ███████████████         VIN: _67034_

Year / Make / Model (Vehicle): _2017 Chrysler Pacifica_

Location #: _7198_          ### Payoff Information

Stock #: _____

Estimated Amount: _____

Quote Amount: _27,575.00_  _9/7_        Good Until: _9_ / _15_ / _20_

Per Diem: _____               Date Quoted: _8_ / _31_ / _20_

Negative Equity: _3,575.00_              Quoted By: _April_

Positive Equity: _____         CarMax BOA: _Alain_

ESP Cancellation: _____        Date of Purchase: ___ / ___ / ___

Total Payoff: _____

I understand that I am entering into an agreement with CarMax for the payoff of the Vehicle to the Lienholder. CarMax agrees to pay the Total Payoff amount stated above on the condition that it receives the Vehicle's title from the Lienholder. Should it be discovered that I owe additional monies, including but not limited to late fees, past due payments, security deposits, penalties, etc., beyond the above payoff, I agree to pay the difference to CarMax. Should the amount owed be less than the Total Payoff amount stated above, a refund will be issued as follows: (1) if I did not finance with a CarMax finance company, the Lienholder will issue me a refund; (2) if I financed with a CarMax finance company and the refund is less than $200, the Lienholder will issue me a refund; or (3) if I financed with a CarMax finance company and the refund is $200 or more, CarMax will send the refund to the Lienholder should be assigned and released to CarMax. I hereby authorize the Lienholder to release any and all information to CarMax as is necessary to process the payoff of the Vehicle.

Customer Signature: _[signature]_                      Date: _8_ / _31_ / _2020_

# Exhibit D

### *MOTOR VEHICLE WHOLESALE EVALUATION AND APPRAISAL*

## 2017 CHRYSLER PACIFICA 4D WAGON LIMITED
## V.I.N. 2C4RC1GG3HR670344

### SEPTEMBER 1, 2020

***PREPARED FOR:***

### MR. ISAAC MARCUSHAMER



### **APPRAISED VALUE $24,900**

***PREPARED BY:***

### SOUTH FLORIDA AUTO APPRAISERS
### STUART RASKIN
### I.A.A.A. CERTIFICATION NO. 1003300011
### FLORIDAAUTOAPPRAISER@GMAIL.COM
### (954) 695-0138

The information contained in this report is privileged and confidential information and is intended only for the use of the individual and/or entity identified. All rights reserved. No part of this document may be reproduced, distributed or transmitted in any form or by any means, including photocopying or other electronic or mechanical methods without prior written consent of the preparer. Any unauthorized possession or distribution is strictly prohibited.

## I.     *SCOPE OF WORK:*

The following Motor Vehicle Wholesale Evaluation and Appraisal has been prepared for Mr. Isaac Marcushamer. Its sole purpose is to establish the subject vehicle's Fair Wholesale Value, defined as the price that a licensed motor vehicle dealer would pay for this vehicle in its present condition. Retailer trade reports and/or auction results form the basis of a wholesale valuatiion.

This appraiser is engaged by the client to render a value conclusion utilizing similar comparable wholesale transactions within the subject vehicle's local market area.  From analyzing and adjusting similar/dissimilar features and grades of the comparable sales, this appraiser is able to render a conclusion as to the subject vehicle's fair wholesale value.  As an integral part of the appraisal process, the appraiser has performed a personal inspection of the subject vehicle. This report is based on the opinions of the appraiser after careful evaluation of the subject vehicle's condition and market analysis.  However, the inspection in no way represents any statements with respect to structural integrity or mechanical fitness.  The details and findings of the inspection are defined further within this report.  This appraiser expressly states that the within evaluation and appraisal in no way represents any warranty or guarantee either expressed or implied.

## II.     *DESCRIPTION:*

The vehicle Identification number as stated above decodes accurately to a 2017 Chrysler Pacifica 4D Wagon Limited. It is a one-owner, upscale, well appointed wagon with an odometer reading of 29,053 miles and no prior damage or accident history.  The subject vehicle came factory equipped with standard equipment as follows:

- **Engine**
  3.6L V6 24V VVT UPG I W/ESS
  Horsepower: 287 @ 6400 RPM
  Torque: 262 @ 4000 RPM
- **Drivetrain**
  Drivetrain: Front Wheel Drive
  Transmission: 9-Speed 948Te Fwd Automatic (Standard)
- **Safety**
  Air Bag-Frontal-Driver & Passenger
  Air Bag-Side Body-Front
  Air Bag-Side Head-Front & Rear
  Brakes-Type-4 Wheel DISC/ABS
  Child Safety Rear Door Locks
  Daytime Running Lights
  Engine Immobilizer
  Headlights-Automatic/High Intensity Discharge
  Parking Aid
  Security System
  Traction Control
- **Comfort & Convenience**
  Air Conditioning-Front & Rear
  Air Conditioning-Multi-Zone/Auto Climate Control
  Auto-Dimming Rearview Mirror
  Cruise Control
  Keyless Entry

Page 1 of 16

Max Seating Capacity: 7
Mirror(s)-Power/Memory
Mirrors-Vanity-Driver & Passenger Illumination
Navigation System
Power Locks
Seat Trim-Leather
Seat(s)-Heated Front
Seat-Adjustable Lumbar-Driver & Passenger
Seat-Memory
Seat-Power Driver & Passenger
Seats-Front & Rear Bucket
Steering Wheel-Leather/Adjustable/Audio Controls
Steering-Power
Trip Computer
Trunk-Release-Remote
Universal Garage Door Opener
Windows-Power
- **Music & Entertainment**
Audio-MP3 Player
Audio-AM/FM Stereo/Satellite Radio
- **Interior**
Floor Mats
Seat-3rd Row
- **Exterior**
Doors: 4
Fog Lamps
Luggage Rack/Roof Rack
Mirror(s)-Heated/Integrated Turn Signals
Rear Spoiler
Rear Window Defogger
Roof-Dual Moon
Windows-Deep Tinted
Wipers-Variable Speed Intermittent
- **Tires**
Front & Rear Tire Size: P245/50R20
- **Wheels**
Wheel Material: Aluminum

## III.        INSPECTION:

A personal inspection was performed on September 1, 2020 at ███████████ Aventura, Fl. 33180.  At the time of the inspection, the vehicle appeared clean, well-kept and had an odometer reading of 29,053 miles.  The inspection consisted of the use of an Elcometer Paint Density Meter which did not evidence any collision damage repairs or refinishing work.  Other than a large scrape to the front bumper cover and two minor door dings, the vehicle's exterior was in good condition.  The interior was clean with no signs of wear or abuse.  Overall, this vehicle would be rated in clean to average condition as defined further within this report.

- Vehicle Identification Number:



- Odometer Reading:



## Exterior Body Panels and Finish










Cosmetic damage to the right lower section of the front bumper cover.  Estimated cost to repair and refinish $500.

 

 

Small Ding to Left Quarter Panel                    Small ding to Right Rear Door

These dings can be repaired by paintless dent repair.  Estimated Cost $150

 

## Wheels and Tires

Left Front

 

Left Rear

 

Right Front

 

Right Rear

 

All four rims are in good condition.  All four Falken 245/50R20 Tires are in need of replacement.  Estimated cost to replace, $500.

## IV.    VALUATION METHODOLOGY AND OBJECTIVES

The objective of this report is to establish a true and accurate representation of the subject vehicle's fair market value. This appraiser chooses to refrain from only subjective perspectives and work with actual wholesale valuations to establish a base-line value.  This methodology allows for accurate value representations by documenting actual dealer to dealer sales transactions and establishing fair trade-in value representations.  Furthermore, dealer to dealer transactions reflect how knowledgeable automotive professionals classify and subsequently value used motor vehicles.  This methodology, allows the appraiser is able to accurately compare the established wholesale value with the prices of similar vehicles being offered for sale in the open marketplace.  For the purpose of obtaining true and accurate value comparisons, vehicles must be classified and rated according to mileage, condition, reconditioning costs and previous accident history.  The National Auto Auction Association utilizes a condition grading scale published on their web-site at www.naaa.com to describe the condition of used motor vehicles. **Mileage is not considered a factor in establishing a vehicle's grade in this scale.** Their definitions are as follows:

- **Grade 5 - Vehicle in excellent condition** •

    PAINT & BODY - Only minor defects in panel surfaces requiring no conventional body or paint work - May have had limited high quality repairs performed - No missing, broken, or damaged parts that require replacement - No visible glass damage.

    INTERIOR - No missing, broken, or damaged parts that require replacement - No cuts, tears, or burns that require repair - Shows no signs of wear - No noticeable offensive odor

    FRAME/UNIBODY - Frame/structure has not been repaired or altered - Expected to measure to published specifications

    MECHANICAL - Mechanically sound - All accessories are operable - All fluid levels full and clean
    TIRES - All match by brand, size and style - Near new condition.

- **Grade 4 – Vehicle is better than average**

    PAINT & BODY - Minor chips or scratches in panel surfaces requiring minor conventional body and paint work - May require removal of small dents that have not broken the paint using Paintless Dent Repair - May have had high quality conventional repairs of cosmetic or light collision damage - May require replacement of minor missing or broken part - No visible glass damage beyond minor pitting of windshield.

    INTERIOR - Clean, showing minimal wear - May require replacement of minor missing or broken part - No noticeable offensive odor

    FRAME/UNIBODY - Frame/structure has not been repaired or altered - Expected to measure to published specifications

    MECHANICAL - Mechanically sound - All accessories are operable - Fluids may require service
    TIRES - All match by brand, size and style - Good or better condition.

- **Grade 3 – Normal wear and tear**

> PAINT & BODY - May require conventional body and paint work - May require replacement of parts - May have sustained cosmetic or light collision damage and been repaired to collision industry standards - Windshield may be damaged

> INTERIOR- Shows signs of normal wear and usage. May require repair or replacement of parts.

> FRAME/UNIBODY - Frame/structure has not been repaired or altered.  Expected to measure to published specifications

> MECHANICAL - Mechanically sound - May require maintenance - May require minor repair of accessories Fluid levels may be low or require replacement
> TIRES - Average or better - Match by size and style

- **Grade 2 – Shows signs of excessive wear and tear**

> PAINT & BODY - Dents, scratches, and body panels that may require replacement - Parts may be broken and missing - May have multiple prior repairs performed at substandard levels - May have repaired or un-repaired collision damage.

> INTERIOR - Shows signs of excess wear - May have burns, cuts, tears, and non-removable stains.

> FRAME/UNIBODY - May have repaired or un-repaired frame/structure damage - May not measure to published specifications.

> MECHANICAL - May have mechanical damage that prohibits vehicle from operating properly - Engine and/or transmission may be in poor condition - Operability of accessories is questionable. TIRES - May be worn or mismatched.

- **Grade 1 – Shows signs of severe abuse -**

> May have sustained major collision damage, but may be drivable -May be cost prohibitive to extensively recondition this vehicle by automotive industry standards Frame/Structure may not measure to published specifications - May have missing or disconnected mechanical parts - Although operable, this vehicle is near the end of its useful life.  Operability of accessories is doubtful.

Based on my personal inspection, it is the opinion of this appraiser that the subject vehicle as observed would be graded as a 3.8 or as being in average condition for the model year pursuant with the NAAA Grading Scale as referenced above.

In addition, this appraiser further utilizes the Black Book Official Used Truck, Van & SUV Guide, Southeast Edition which gathers information from various national auction houses throughout the Southeast Region and publishes this information on a semi-monthly. This publication is the most highly utilized publication for used motor vehicle valuations in the industry, and will be found on the desk of nearly every used car manager in the country. The four classifications used by the Black Book are extra clean, clean, average and rough. Generally,

- **Extra clean**: Those vehicles that are in pristine condition with exceptionally low mileage. Extra clean vehicles need very little or no reconditioning and are basically ready for sale. Extra clean vehicles will be all original paint and have very minor if any flaws on the paint, body or interior.

- **Clean:** Vehicles rated as clean are those with better than average wear and tear. These vehicles may need some minor reconditioning and have a good overall appearance.

- **Average**: Average vehicles are those which require some reconditioning with minor flaws to the exterior and interior. Average vehicles are those with odometer readings at or about the regional average of 12,000 miles per year. Vehicles which have had minor prior paint would generally be rated at average regardless of having low mileage. Minor dollar adjustments for the extent of the repaint may also be considered.

- **Rough**: These vehicles would require extensive recondition, or would have mileage in excess of the regional average of 12,000 miles per year. Vehicles with prior unibody damage are generally rated as rough regardless of low mileage and dollar adjustments for the extent of the repairs may also be considered.

Based on my personal inspection, it is the opinion of this appraiser that the subject vehicle to be graded as Average for the model year pursuant with the Black Book Grading Scale as referenced above.

*V.*     *WHOLESALE MARKET RESEARCH:*

To establish the wholesale value of a 2017 Chrysler Pacifica 4D Wagon Limited, this appraiser performed a search of the Manheim Auto Auction sales report for the period ending August 31, 2020. The report identified a total of forty two transactions for vehicles of the same year make and model. This appraiser analyzed all forty two actual transactions and as such has determined that the wholesale value of the subject vehicle as observed, based on today's values is as follows:

- Condition:   3.8        Mileage:   29,053      Sales price:   $25,400

A true copy of all documented transactions is attached as Pages 10-12 of this report.

Manheim | MMR | CHRYSLER PACIFICA | September 1, 2020 US Edition                                                    9/1/20, 12:18 PM

 **MANHEIM MARKET REPORT**  September 1, 2020 US Edition

Learn more about MMR in today's volatile market and see a daily trend of MMR Retention          ✕

## 2017 CHRYSLER PACIFICA 4D WAGON LIMITED
2C4RC1GG3HR670344

### MMR

| BASE | ADJUSTMENTS | ADJUSTED |
|---|---|---|
| **$24,500** | Odometer<br>29,053 mi \| +$1,390 | **$25,400** ▲ |



| Avg Odo (mi) | Avg Cond |
|---|---|
| 43,452 | 3.9 |

**Typical Range**
$22,200 - $26,800

Region
Southeast | +$40

AutoGrade
3.5 | -$640

Ext Color
White | +$110

Numbers may not add exactly due to rounding

$24,500

$22,200        $26,800

### ▾ Similar Vehicles for Sale                                    View All ❯

   

Adj MMR $19,100    Adj MMR $17,200    Adj MMR $24,500    Adj MMR $24,7

| '17 Pacifica | '17 Pacifica | '17 Pacifica | '17 Pacifica |
|---|---|---|---|
| Touring | Touring | Touring-L Plus | Touring-L Plus |
| 19,916mi \| CR 4.0 | 22,920mi \| CR 2.4 | 21,444mi \| CR 3.6 | 22,117mi \| SD |

### ▾ Transactions    Showing 42 of 42                              ⛛ Filter    ⬚ Export

| Date ▾ | Price | Odo (mi) | Cond | Eng/T | Ext Color | Type | Region | Auction |
|---|---|---|---|---|---|---|---|---|
| 8/27/20 | $21,500 | 81,642 | 4.5 | 6G/A | Red | Regular | Midwest | Detroit |
| 8/27/20 | $24,400 | 34,095 | 3.6 | 6G/A | Black | Regular | Midwest | Detroit |

https://mmr.manheim.com/?WT.svl=m_uni_hdr_buy&classic=true&col...e=29053&popup=true&region=SE&source=man&vin=2C4RC1GG3HR670344          Page 1 of 3

| 8/27/20 | $23,500 | 62,658 | 3.9 | 6G/A | Gray | Lease | Midwest | Detroit |
| 8/26/20 | $23,400 | 53,496 | 3.9 | 6G/A | White | Regular | Northeast | New Jersey |
| 8/25/20 | $18,800 | 97,960 | 4.5 | 6G/A | White | Lease | Southeast | Orlando |
| 8/25/20 | $23,900 | 40,225 | 3.9 | 6G/A | White | Regular | Southeast | Orlando |
| 8/24/20 | $24,000 | 39,251 | -- | 6CY/A | White | Regular | Northeast | New England |
| 8/24/20 | $25,500 | 40,380 | 4.1 | 6G/A | Gray | Lease | Southeast | North Carolina |
| 8/24/20 | $21,900 | 76,103 | 4.0 | 6G/A | Black | Lease | West Coast | California |
| 8/21/20 | $25,750 | 40,242 | 4.3 | 6G/A | Red | Regular | Northeast | Pennsylvania |
| 8/20/20 | $20,700 | 74,637 | 3.8 | 6G/A | Gray | Lease | Northeast | Philadelphia |
| 8/20/20 | $24,500 | 41,613 | 3.7 | 6G/A | Silver | Lease | Midwest | Louisville |
| 8/19/20 | $26,200 | 31,244 | 3.9 | 6G/A | Red | Lease | Midwest | Milwaukee |
| 8/19/20 | $28,250 | 12,481 | 4.2 | 6G/A | Black | Lease | West Coast | San Francisco Bay |
| 8/19/20 | $23,500 | 57,687 | 4.1 | 6G/A | Gray | Lease | Southwest | Dallas |
| 8/19/20 | $24,500 | 47,093 | 4.1 | 6G/A | White | Lease | Northeast | New Jersey |
| 8/18/20 | $28,000 | 13,494 | 3.3 | 6G/A | Red | Lease | Midwest | Chicago |
| 8/18/20 | $23,750 | 30,020 | 3.2 | 6G/A | Blue | Lease | West Coast | Riverside |
| 8/18/20 | $27,000 | 31,234 | -- | 6CY/A | Silver | Regular | Midwest | Chicago |
| 8/13/20 | $23,000 | 60,003 | 4.6 | 6G/A | White | Lease | West Coast | Southern California |
| 8/12/20 | $22,700 | 55,689 | 2.9 | 6G/A | Gray | Regular | Northeast | Pittsburgh |
| 8/12/20 | $26,300 | 34,838 | 4.4 | 6G/A | Black | Lease | Southwest | San Antonio |
| 8/12/20 | $24,200 | 48,303 | 2.7 | 6G/A | Gray | Regular | Midwest | Milwaukee |
| 8/12/20 | $23,250* | 24,598 | 2.7 | 6G/A | Black | Lease | Southwest | Dallas |
| 8/12/20 | $22,100* | 40,223 | 2.6 | 6CY/A | White | Lease | Southeast | Daytona Beach |
| 8/11/20 | $25,700 | 35,054 | 4.2 | 6G/A | Silver | Lease | Northeast | Baltimore-Washington |
| 8/11/20 | $26,250 | 37,025 | 4.6 | 6G/A | Gray | Lease | Southeast | Statesville |
| 8/10/20 | $26,500 | 35,624 | -- | 6G/-- | Gray | Regular | Southeast | Palm Beach |
| 8/7/20 | $25,750 | 33,462 | 4.6 | 6G/A | Gray | Regular | West Coast | Nevada |
| 8/7/20 | $25,100 | 35,649 | 3.7 | 6G/A | White | Lease | Northeast | Pennsylvania |
| 8/7/20 | $22,750 | 38,931 | 4.0 | 6G/A | Red | Regular | Northeast | Pennsylvania |
| 8/6/20 | $26,750 | 31,998 | 3.6 | 6G/A | Gray | Factory | Midwest | Chicago |
| 8/6/20 | $23,000* | 29,014 | 2.1 | 6G/A | Black | Lease | Midwest | Detroit |
| 8/6/20 | $15,000* | 118,145 | 3.5 | 6G/A | Black | Lease | West Coast | Southern California |
| 8/5/20 | $24,400 | 52,528 | 4.0 | 6G/A | White | Lease | Northeast | New Jersey |

Manheim | MMR | CHRYSLER PACIFICA | September 1, 2020 US Edition                                                    9/1/20, 12:18 PM

| 8/5/20 | $25,250 | 28,910 | 3.9 | 6G/A | Gray | Lease | West Coast | San Francisco Bay |
| 8/5/20 | $27,250 | 16,308 | 4.1 | 6G/A | White | Lease | Southwest | Dallas |
| 8/5/20 | $18,400 | 101,420 | 4.1 | 6G/A | Gray | Regular | Southeast | Statesville |
| 8/4/20 | $26,250 | 16,086 | 4.1 | 6G/A | Red | Lease | Southeast | Pensacola |
| 8/4/20 | $25,000 | 35,774 | 3.7 | 6G/A | Black | Lease | Northeast | Baltimore-Washington |
| 8/4/20 | $27,100 | 35,870 | 4.8 | 6G/A | Black | Lease | Northeast | Baltimore-Washington |
| 8/4/20 | $26,750 | 12,142 | 2.8 | 6G/A | Black | Lease | West Coast | Riverside |

**Showing 42 of 42**
* Transactions not in sample
Condition Reports from AutoGrade

## Historical Average

| Past 30 Days | 6 Months Ago | Last Year |
| --- | --- | --- |
| $24,600 | $23,700 | $25,900 |
| **43,452 mi** | **38,964 mi** | **37,815 mi** |

## Projected Average

Next Month

$24,200

## Estimated Retail Value
Based on Advertised Retail Prices

# $28,300

Typical Range
**$25,500 - $29,300**

The Black Book dated September 1, 2020 reflects the Wholesale Value for a 2017 Chrysler Pacifica 4D Wagon Limited in Average Condition with 29,053 miles as follows:

- Condition: Average      Mileage: 29,053      Value: $25,700

Black Book Print Vehicle                                                                                    9/1/20, 3:15 PM

**Contact Information**                                    9/1/2020

Company: Individual Users                    Telephone: 954 458-7427
Contact: Stuart Raskin                          Fax:
E-Mail: floridaautoappraiser@gmail.com

**Notes**

**Vehicle Info For  2017 Chrysler Pacifica Limited Wagon**

| MSRP: $42,495 | VIN: 2C4RC1GG3HR670344 | Adj. State: Florida |
|---|---|---|
| Loan Value: $28,150 | UVC: 2017180613 | Mileage: 26001 |
| Equip Ret: $43,665 | MPG: 18/28 | Mileage Cat: D |
| Tire Size: 235/60R18 | Weight: 600S | Cylinders: 6 |
| Base HP: 287 @ 6400 | Fuel Type: Flex | Transmission: A |
| Taxable HP: 34.3 | Wheelbase: 121.6 | Drive Train: FWD |
| Model Number: RUCT53 | End of Term Months: 0 | End of Term Mileage: 0 |
| Price Includes: AT AC CC | | |

**Wholesale Black Book values as of 8/31/2020**

| | X-CL | Clean | Average | Rough |
|---|---|---|---|---|
| Base | $26,625 | $25,125 | $22,925 | $20,925 |
| Options | $1,200 | $1,200 | $1,200 | $1,200 |
| Mileage | $800 | $1,200 | $1,575 | $1,700 |
| Region | $0 | $0 | $0 | $0 |
| Adjusted | $28,625 | $27,525 | $25,700 | $23,825 |

| History Adjustments | Get VIN specific precision! Call 1-800-554-1026 for History Adjusted Valuations |
|---|---|

*History Adjustments are calculated for events present on the Experian AutoCheck® report as of today.

**Trade In Black Book values as of 8/31/2020**

| | X-CL | Clean | Average | Rough |
|---|---|---|---|---|

https://www.blackbookpricepoint.com/print/?document=PricePoint                                      Page 1 of 2

Page 13 of 16

Black Book Print Vehicle                                                                                   9/1/20, 3:15 PM

| | | | | |
|---|---|---|---|---|
| **Base** | N/A | $25,500 | $23,475 | $19,665 |
| **Options** | N/A | $1,200 | $1,200 | $1,200 |
| **Mileage** | N/A | $1,200 | $1,575 | $1,700 |
| **Region** | N/A | $0 | $0 | $0 |
| Adjusted | N/A | $27,900 | $26,250 | $22,565 |

| | |
|---|---|
| **History Adjustments** | Get VIN specific precision! Call 1-800-554-1026 for History Adjusted Valuations |

\*History Adjustments are calculated for events present on the Experian AutoCheck® report as of today.

### Retail Black Book values as of 8/31/2020

| | X-CL | Clean | Average | Rough |
|---|---|---|---|---|
| **Base** | $30,400 | $28,725 | $25,575 | $23,450 |
| **Options** | $1,200 | $1,200 | $1,200 | $1,200 |
| **Mileage** | $800 | $1,200 | $1,575 | $1,700 |
| **Region** | $0 | $0 | $0 | $0 |
| Adjusted | $32,400 | $31,125 | $28,350 | $26,350 |

| | |
|---|---|
| **History Adjustments** | Get VIN specific precision! Call 1-800-554-1026 for History Adjusted Valuations |

\*History Adjustments are calculated for events present on the Experian AutoCheck® report as of today.

### Black Book Add/Deducts

 20–Inch Wheels +600
✓ Sunroof +600

As a further point of reference, this appraiser performed a search of the NADA Vehicle Value Guide for September 1, 2020. The NADA reflects the average trade-in value of a 2017 Chrysler Pacifica 4D Wagon Limited with 29,053 miles as follows;

- Average Trade-In Base Value:  $24,175

- Mileage Adjustment 29,053:  $1,725

- Adjusted Average Trade-In Value:  $24,750

2017 Chrysler Pacifica Wagon 4D Limited V6 Prices, Values & Specs - NADAguides      9/1/20, 1:36 PM

Did you know J.D. Power's industry-leading valuations data drives NADAguides.com? Learn more

**J.D. POWER**   [NADA]   NADAguides Value Report   9/1/2020

# 2017 Chrysler Pacifica
**Wagon 4D Limited V6**

### Values

| | Rough Trade-In | Average Trade-In | Clean Trade-In | Clean Retail |
|---|---|---|---|---|
| Base Price | $21,125 | $22,550 | $23,700 | $26,200 |
| Mileage (29,053) | $1,725 | $1,725 | $1,725 | $1,725 |
| Total Base Price | $22,850 | $24,275 | $25,425 | $27,925 |
| **Options** | | | | |
| Rear Entertainment System | $475 | $475 | $475 | $525 |
| **Price + Options** | **$23,325** | **$24,750** | **$25,900** | **$28,450** |

Selling Your Car? **Get an Online Offer in 2 Minutes.**

| | | | | |
|---|---|---|---|---|
| Certified Pre-Owned (CPO) | | | | +$1,250 |
| **Certified Price with Options** | | | | **$29,700** |

https://www.nadaguides.com/Cars/2017/Chrysler/Pacifica/Wagon-4D-Limited-V6/Values/Print                     Page 1 of 1

By averaging the Manheim Auto Auction, Black Book and NADA Values, the conclusion can be made that the subject vehicle has a substantiated wholesale or trade-in value of or about **$25,283.33**. This amount is an accurate representation of what a consumer could expect to receive as a **trade-in value**, in today's market after replacing all four tires.

*VI.*          *CONCLUSION:*

The subject vehicle is a one-owner 2017 Chrysler Pacifica 4D Wagon Limited with 29,053 miles and no reported or unreported accident history. After performing a personal evaluation, it is the opinion of this appraiser that the subject vehicle would have been considered in average to clean condition with a grade of 3.5 as defined above. This graded takes into account the scrape on the front bumper cover and two door dings. This appraiser performed research of Manheim Auto Auction, Black Book and the NADA to establish current wholesale or trade-in values. Said research identified that these vehicles, with 29,053 miles and graded as a 3.5 have a wholesale or trade-in value of or about $25,283.33. This appraiser has estimated the cost to replace all four Falken 245/50R20 tires at $500, which should be deducted from the referenced wholesale value. Therefore, based on all of the research evidenced above, it is the opinion of this appraiser that a fair and accurate representation of the subject vehicle's fair wholesale value can be established at or about $24,900.


I hereby certify that the information contained within this report is true and accurate to the best of my knowledge. The opinions and conclusions contained within this report have been prepared according the Uniform Standards of Professional Appraisal Practice and the Uniform Standard for Automotive Appraisal Procedure. I hold certification with the International Association of Automobile Appraisers and had been a licensed Independent Automobile Dealer in the State of Florida for over twenty years. With over thirty years of experience in the Automotive Industry I have provided my expert opinion on several litigation matters throughout the State of Florida. The information and opinions contained within this report are independent, unbiased and are not in any way contingent upon any predetermined value. The seller, potential purchaser, finance company or any other entity which has or may have any financial interest in the subject automobile agrees to hold South Florida Auto Appraisers and any affiliates harmless for any claims, actions, or causes of action which exist or may arise on the basis of this report. This report and the within evaluation must not be construed as any offer to purchase. This appraiser has not examined nor verified that the subject vehicle has a marketable title, the person for whom this appraisal has been prepared is the rightful owner or has the authority to make any representations thereto. It is understood and agreed that any decision with respect this appraiser's opinion of value, the acceptance of any purchase offer(s), financing or insurable interest related thereto, rests solely with the vehicle's owner, seller or any agent thereof. The individual or entity for whom this appraisal was prepared understands and agrees that any representation of value contained within this report is the sole opinion of this appraiser. As such, this appraiser does not represent nor warrant that the appraised value in any way represents an actual selling price. This appraiser warrants that he is not and has not been part of any purchase offer or decision in conjunction with the findings within report. The appraiser's engagement is to render a value conclusion totally disconnected from any pre-determined values and without bias. This appraiser has valued the subject vehicle relative to the market conditions on the date specified within this report. This appraiser has no financial connection or undisclosed relationship with the vehicle's owner or any other entity stated within this report. This report is for informational purposes only. The individual for whom this report was prepared or any party relying upon the information contained herein, hereby expressly agrees that in the event of any errors or omissions the sole remedy to such parties shall be limited to the fee paid for the services provided herein.

Photographs, research documentation and notes are available upon request.

Stuart Raskin - IAAA Certification No. 1003300011
Vehicle Valuation Specialists, LLC/DBA South Florida Auto Appraisers

# Exhibit E

for dealer purchase for inventory only
r resale to customer returning the
. If additional charges (for example,
summons, summons fee, late
or return check fee) are assessed
e date of this quote the lessee will be
sible for those charges.

## Contract and Payment In

**Contract Start Date:** 05/13/2017

**Scheduled End Date:** 11/12/202

**Term:** 42 months

**Monthly Payment:** $495.87

# Exhibit F



## BUYERS/LESSEE TRADE-IN OR
## LEASE TERMINATION PAYOFF AUTHORIZATION
## AND VERIFICATION AGREEMENT

Dealer: _____ Hollywood Chrysler Jeep _____

Buyer/Lessee: _____ ISAAC MARCUSHAMER _____   VIN: 2 C 4 R C 1 G G 3 H R 6 7 0 3 4 4

Description of Vehicle: __2017__   __Chrysler__   __Pacifica__   Current Mileage: _____ 29066
                              Year        Make        Model

Name on Account: _____ Isaac  Marcushamer _____

Account Number: _____ ███████ _____

Name of Lienholder/Lessor: _____ ALLY FINANCIAL _____

Lienholder Address: _____ 6716 GRADE LN BLG 9 SUITE 910 _____

City/State/Zip: _____ LOUISEVILLE KY 40213 _____   Phone: _____

Amount: _____ 27,575.00 _____   Per day if Applicable: _____

Date Payoff Verified: _____ 9/1/20 _____   Good Until: _____ 9/8/20 _____   Payoff Given By: _____ ONLINE

### LEASE

f Purchase/Trade-in:

Payoff Amount $ _____   Good Thru _____ 9/8/20

Security $ _____   Total _____ 27575.00

f Balance of Payments / Lease Return

Hollywood Chrysler Jeep _____ monthly lease payments of $____ for a total of $_____   Dealer neither assumes

nor makes any representation as to any other obligations associated with such lease.

### LEASE

f Balance of Payments / Lease Return

Hollywood Chrysler Jeep will pay the last _____ monthly lease payments of $__ , Plus Excess Mileage_____ x_____ ¢ =

_____ sales tax_____ % for a total of $_____   Dealer neither assumes nor makes any representation as to any other obligations

associated with such lease.

### LOAN

Payoff Amount $ _____   Good Thru _____

Per Diem $ _____   x10 days $ _____   Total $ _____

| ALLOW 10 DAYS FROM DATE OF PAYOFF "GOOD UNTIL" DATE TO ALLOW FOR PROCESSING |
| --- |

This Agreement is attached to and forms a part of that certain Retail Buyers Order or Lease Order ("Order") between Dealer and the Buyer(s)/Lessee(s)
and concerns the vehicle identified in this transaction as a trade-in or lease termination vehicle, accordingly, the undersigned represents and warrants to
Dealer that there are no liens on the trade-in/lease termination vehicle other than those expressly acknowledged in writing signed by the parties. Further,
the undersigned does: (i) hereby acknowledge and authorize Dealer to payoff the above account and have title to the above describe vehicle mailed
directly to Dealer: (if the vehicle being paid off is a lease or if the vehicle is a lease termination, Dealer is not responsible for any payments, fees or other
charges in connection with the lease termination, including, but not limited to mileage charges, wear and tear, or lease termination fee except as expressly
acknowledged in a writing signed by the parties) and (ii) fully understand and agree that in the event the amount computed as my/our payoff on the Order
s understated (since it was an estimated payoff because an exact number could not be confirmed at the time of delivery) and the actual payoff is higher
han the amount stated. I/we agree to pay Dealer any additional monies owed within 48 hours of being notified of the additional amount due. If any legal
action is brought to enforce or defend any of the terms of this Agreement, Dealer shall be entitled to recover its cost and reasonable attorneys' fees (up
through and including any appellate proceedings) in additional to any damages at law or a remedy in equity. If payment is not received, the undersigned
customer authorizes Hollywood Chrysler Jeep to record a lien on the vehicle being purchased or leased. I/we further state there are no additional liens on
he vehicle I/we are trading to Hollywood Chrysler Jeep.

_____   Date: _____ 09/02/2020
Buyer/Lessee Signature

_____   Date: _____ 09/02/2020
Buyer/Lessee Signature

_____ PETER BASSUK _____   Date: _____ 09/02/2020
Payoff Verified By

# Exhibit G

Stk # HP— *12196*

Manager Purchasers UNIT X

Sales Person X *Peter Bassile*

| DATE | PURCHASED FROM | AMOUNT | PURCHASE FEE | TOTAL |
|---|---|---|---|---|
| 9/7/20 | *Isaac Marcusshamer* | $26,575 | $800.00 | $ |

*Pyoff $27,575*

| BLACK BOOK AVERAGE LOAN | |
|---|---|
| Base Loan | $ |
| Sport Wheels | $ |
| CD or Cassette | $ |
| Cruise | $ |
| Power Window | $ |
| Power Seat | $ |
| T. Top's | $ |
| _____ Pkg. | $ |
| 4 Wheel Drive | $ |
| Deduct No AC | $ |
| Deduct Stick | $ |
| Deduct Cyl | $ |
| TOTAL AVG. LOAN BLACK BOOK | $ |

| CONDITION REPORT | | ESTIMATED REPAIRS |
|---|---|---|
| Body | $ | |
| Paint | $ | |
| Interior | $ | |
| Tires | $ | |
| Air Conditioning | $ | |
| Engine | $ | |
| Power Steering | $ | |
| Brakes | $ | |
| Radio | $ | |
| Power (Wind) (Locks) | $ | |
| Other _____ | $ | |
| Inspection & L.O.F. | $ | |
| Full Detail | $ | |
| TOTAL ESTIMATED RECONDITIONING | $ | |

*Due from customer $100*
*Pyoff Diff.*

## USED CAR & TRUCK PURCHASE FORM

| YR | MAKE | MODEL | VEHICLE IDENTIFICATION # | COLOR | MILEAGE | CYL | TRANS |
|---|---|---|---|---|---|---|---|
| 17 | Chrysler | Pacifica | 2C4RC1GG3HR670344 | White | 29,066 | 6 | A. |

Lien Amount if any $ 27,575.—      Bank *Ally Financial*

Lien Verified by *Ally Online.*      Good Till 9/7/20

**IT'S THE LAW:** Federal regulations require you to state the odometer mileage upon transfer of ownership. An inaccurate or untruthful statement may make you liable for damage to your transferee, for attorney fees, and for civil or criminal penalties, pursuant to sections 409, 412, and 413 of the Motor Vehicle information and Cost Savings Act of 1972 (Pub. L. 92-513, as amended by Pub. L. 94-364).

## VEHICLE DESCRIPTION

| Vehicle Identification Number | Year | Make | Model | Body | Title No. |
|---|---|---|---|---|---|
| 2C4RC1GG3HR670344 | 17 | Chrysler | Pacifica | VAN. | |

## ODOMETER DISCLOSURE STATEMENT

**WARNING:** Federal law and State law require that you state the mileage in connection with transfer of ownership. Providing a false statement may result in fines and/or imprisonment.

I/WE *Isaac Marcusshamer* STATE THAT THE ODOMETER NOW READS 29,066 ☐ (NO TENTHS) MILES, DATE READ 9/2/20, AND TO THE BEST OF MY KNOWLEDGE THAT IT REFLECTS THE ACTUAL MILEAGE OF THE VEHICLE DESCRIBED ON THIS DOCUMENT UNLESS ONE OF THE FOLLOWING IS CHECKED:

☐ I HEREBY CERTIFY THAT, TO THE BEST OF MY KNOWLEDGE, THE ODOMETER READING REFLECTS THE AMOUNT OF MILEAGE IN EXCESS OF ITS MECHANICAL LIMITS

☐ I HEREBY CERTIFY THAT THE ODOMETER READING IS NOT THE ACTUAL MILEAGE WARNING • ODOMETER DISCREPANCY

_____          _____          _____          _____
(Sellers Signature)                    (Sellers Printed Name)                    (Buyers Signature)                    (Buyers Printed Name)

_____          _____
Transferor's Street Address                    Transferor's Street Address

Check # _____          Title OK: _____

White - Used Cars          Yellow - Accounting          Pink - General Manager

# Exhibit H

**CHRYSLER ✦ Jeep**
2100 N State Road 7 · Hollywood, FL 33021
Broward - (954) 962-6400 · Dade - (305) 696-8600
www.HollywoodChryslerJeep.com

388090

| AMOUNT | PAID BY | COMMENT |
|---|---|---|
| 1,000.00 | AM-EX | C#805481 HP#12196 DIFF IN PAYOFF |
| | | PETER |

ISAAC MARCUSHAMER

805481

TOTAL RECEIVED:      $1,000.00

DATE-TIME: 02SEP2020 12:30
CASHIER: BRIANA
LOCATION:
CASH DRAWER:

## ACCOUNTING DISTRIBUTION

| CO | JOURNAL | CO | ACCOUNT | AMOUNT | CONTROL | CONTROL2 |
|---|---|---|---|---|---|---|
| 1 | 50 | 1 | 11003 | 1,000.00 | 388090 | |
| | | 1 | 11100 | -1,000.00 | 805481 | AM-EX |

CASH
RECEIPT

Copyright 2000 ADP, Inc. CASH RECEIPT XCR1C

**CUSTOMER COPY**