**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**Case No. 21-cv-80402-Dimitrouleas/Matthewman**

ISAAC MARCUSHAMER, individually and
on behalf of all others similarly situated,

                Plaintiff,

vs.

ALLY FINANCIAL INC., a Delaware
Corporation; ALLY BANK LEASE TRUST,
a Delaware Entity,

                Defendant.

<u>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**</u>

<u>**FIRST AMENDED COMPLAINT**</u>

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION .................................................................................................1

II.     STATEMENT OF FACTS ...................................................................................1

      A.      Ally Fails to Accurately Disclose the Conditions for Determining the Early Termination Charge in its Lease. .................................................................1

      B.      Ally's "Early Termination Dealer Purchase for Inventory" Transaction Violates the CLA and Constitutes a Breach of the Lease. ...............................................2

III.    ALLY'S MOTION TO DISMISS SHOULD BE DENIED ...............................................3

      A.      Legal Standard. .........................................................................................3

      B.      Plaintiff has Properly Stated a Claim for Breach of Contract.................................3

            1.      Ally Breached the Lease by not Selling Plaintiff's Vehicle at its Wholesale Value. .....................................................................................4

            2.      Plaintiff Has Plausibly Alleged Resulting Damages. ..................................5

      C.      Ally is Responsible for the Charges Imposed by Its Agents, the Dealers. ..............6

            1.      Plaintiff has Adequately and Plausibly Alleged that there was an Actual Agency Relationship (Both Express and Implied) Between Ally and the Dealers, Including the Hollywood Dealership.............................................7

            2.      Plaintiff has Adequately and Plausibly Alleged that the Hollywood Dealership was Acting "During the Course" of its Agency Relationship with Ally and to "Further a Purpose or Interest" of Ally when it Charged Plaintiff $1,000 as part of an ET DI Transaction.........................................8

            3.      Ally's Attempt to Characterize the ET DI Transaction as an Independent Transaction from the Lease is Unavailing. .................................................11

            4.      Ally's Implicit Reliance on the "Voluntary Payment Doctrine" is Misplaced. ...............................................................................................12

      D.      Plaintiff Has Properly Alleged a Violation of the CLA and Regulation M...........13

      E.      Plaintiff has Properly Alleged a Violation of the FMVLDA................................16

      F.      Plaintiff has Properly Alleged Violations of FDUTPA. ........................................16

            1.      Ally's Violations of the CLA and FMVLDA Constitute *Per Se* Violations of FDUTPA.............................................................................................16

2.      Plaintiff was Harmed and Aggrieved by Ally's Failure to Accurately Disclose the Methods for Calculating the Early Termination Charge. .......17

3.      Ally's Blanket Prohibition on Transferring the Purchase Option Constitutes a Deceptive and Unfair Practice. .............................................18

G.      The FAC is not an Improper Shotgun Pleading. ....................................................20

IV.   CONCLUSION ...............................................................................................................20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American United Life Insurance Co. v. Martinez*,
   480 F.3d 1043 (11th Cir. 2007) ................................................................. 3, 11

*Applebaum v. Nissan Motor Acceptance Corp.*,
   226 F.3d 214 (3rd Cir. 2000) ....................................................................... 15

*Ashcroft v. Iqbal*,
   129 S. Ct. 1937 (2009) .................................................................................. 3

*Baez v. P Baez v. Potamkin Hyundai, Inc.*,
   2010 WL 11553183 (S.D. Fla. 2010) ........................................................... 14

*Banco Espirito Santo International, Ltd. v. BDO International, B.V.*,
   979 So. 2d 1030 (Fla. 3d. DCA 2008) ...................................................... 7, 8

*Beck v. Lazard Freres & Co., LLC*,
   175 F.3d 913 (11th Cir. 1999) ...................................................................... 3

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ....................................................................................... 3

*Brink v. Raymond James & Associates, Inc.*,
   341 F.Supp.3d 1314 (S.D. Fla. 2018) ..................................................... 12, 13

*Carmichael v. Nissan Motor Acceptance Corp.*,
   291 F.3d 1278 (11th Cir. 2002) .................................................................. 13

*Carrero LVNV Funding, LLC*,
   2014 WL 6433214 (Oct. 27, 2014) ............................................................ 12

*Channell v. Citicorp National Services, Inc.*,
   89 F.3d 379 (7th Cir. 1996) ....................................................................... 15

*Chavez v. Mercantil Commercebank, N.A.*,
   701 F.3d 896 (11th Cir. 2012) ...................................................................... 5

*Clayton v. Howard Johnson Franchise Systems, Inc.*,
   954 F.2d 645 (11th Cir. 1992) .................................................................... 11

*Commodity Futures Trading Commission v. Gilbraltar Monetary Corp., Inc*,
   2006 WL 1789018 (S.D. Fla. May 30, 2006) ............................................... 6

*Cox v. Porsche Financial Services, Inc.*,
   342 F.Supp.3d 1271 (S.D. Fla. 2018) ................................................. *passim*

*Esso International, Inc. v. S.S. Captain John*,
   443 F.2d 1144 (5th Cir. 1971) ...................................................................... 6

*Federal Deposit Insurance Corp. v. University Anclote, Inc.*,
   764 F.2d 804 (11th Cir. 1985) ...................................................................... 5

*Galstaldi v. Sunvest Communities USA, LLC*,
  637 F.Supp.2d 1045 (S.D. Fla. 2009) ........................................................ 18

*Hall v. Sargeant*,
  2020 WL 1536435 (S.D. Fla. March 30, 2020) ........................................... 7

*Hardwick Properties, Inc. v. Newbern*,
  711 So.2d 35 (1998)................................................................................... 6

*Herrera v. First Northern Savings & Loan Association*,
  805 F.2d 896 (10th Cir. 1986) .................................................................. 18

*Highsmith v. Chrysler Credit Corp.*,
  18 F.3d 434 (7th Cir. 1994) ............................................................... 15, 16

*Jones v. TT of Longwood, Inc.*,
  2006 WL 2789140 (M.D. Fla. Sept. 26, 2006) ......................................... 17

*Kedziora v. Citicorp National Services, Inc.*,
  901 F.Supp. 1321 (N.D. Ill. 1995) ........................................................... 15

*Kenneth F. Hackett & Associates, Inc. v. GE Capital Information Technology
  Solutions, Inc.*,
  744 F. Supp. 2d 1305 (S.D. Fla. 2010) ............................................... 19, 20

*Lombardo v. Johnson & Johnson Consumer Companies, Inc.*,
  124 F.Supp.3d 1283 (S.D. Fla. 2015) ....................................................... 17

*Martorella v. Deutsche Bank National Trust Co.*,
  931 F.Supp.2d 1218 (S.D. Fla. 2013) ....................................................... 20

*Miller v. Nissan Motor Acceptance Corp.*,
  362 F.2d 209 (3rd Cir. 2004) ............................................................. 14, 16

*Motor Credit Corp v. Woolverton*,
  99 So.2d 286 (Fla. 1957) ........................................................................... 8

*N.R. by Ragan v. School Board of Okaloosa County, Florida*,
  418 F. Supp. 3d 957 (N.D. Fla. 2019) ...................................................... 20

*Ordonez v. Icon Sky Holdings, LLC*,
  2011 WL 3843890 (S.D. Fla. Aug. 30, 2011) ........................................... 16

*R.B. v. A.B.*,
  2007 WL 1557136 (Del. Fam. Ct. Apr. 16, 2007)....................................... 5

*Schojan v. Papa John's International Inc.*,
  34 F.Supp.3d 1206 (M.D. Fla. 2014) ........................................................ 13

*Speedway SuperAmerica, LLC v. Tropic Enterprises, Inc.*,
  966 So.2d 1 (Fla. 2d DCA 2007) ............................................................. 19

*State Farm Mutual Automobile Insurance Co. v. Performance Orthopaedics &
  Neurosurgery, LLC*,
  278 F. Supp. 3d 1307 (S.D. Fla. 2017) ............................................... 17, 19

*Trevarthen v. Wilson*,
    219 So.3d 69 (Fla. Dist. Ct. App. 2017) ................................................................. 6, 8, 10, 11

*Weiland v. Palm Beach County Sheriff's Office*,
    792 F.3d 1313 (11th Cir. 2015) ............................................................................. 20

*Yung Kim v. General Motors, LLC*,
    99 F. Supp. 3d 1096 (C.D. Cal. 2015) ................................................................. 14

## Statutes

15 U.S.C. § 1640(a)(2)(A) ............................................................................................ 18

15 U.S.C. § 1640(a)(2)(B) ............................................................................................ 18

15 U.S.C. § 1667(3) ..................................................................................................... 14

15 U.S.C. § 1667a(11) ........................................................................................ *passim*

Fla. Stat. § 501.202 ...................................................................................................... 17

Fla. Stat. § 501.203(3)(c) ............................................................................................. 16

Fla. Stat. § 521.004(1) ................................................................................................. 16

Fla. Stat. § 521.006(1) ................................................................................................. 18

Fla. Stat. § 725.04 ....................................................................................................... 13

## Other Authorities

12 C.F.R. § 213.4(g)(1) .......................................................................................... 14, 15

2 Fla. Jur. 2d Agency & Employment § 62 (2015) ...................................................... 6

## I.     INTRODUCTION

In effort to manufacture a basis for their motion to dismiss, Defendants Ally Financial, Inc. and Ally Bank Lease Trust (collectively, "Defendants") improperly ignore and misrepresent the allegations in the First Amended Complaint ("FAC").  A review of the actual allegations in FAC demonstrates that Plaintiff Isaac Marcushamer ("Plaintiff") has properly and plausibly alleged the requisite elements for each of his claims.  The motion should be denied.

## II.     STATEMENT OF FACTS

### A.     Ally Fails to Accurately Disclose the Conditions for Determining the Early Termination Charge in its Lease.

Ally is in the business of providing auto leases for consumers.  FAC, ¶ 2.  Ally's leases are standard form contracts that it refers to as the SmartLease Agreement (the "Lease").  *Id.*

Under the federal Consumer Leasing Act (the "CLA"), Ally is required to provide a written statement in its lease agreement setting out "accurately and in a clear and conspicuous manner" information about the lease, including "[a] statement of the conditions under which the lessee or lessor may terminate the lease prior to the end of the term and the amount or method of determining any penalty or other charge for . . . early termination."  15 U.S.C. § 1667a(11).

Ally's Lease discloses three methods for determining the early termination charge when a customer wishes to end the lease early.  FAC, ¶ 7.

The first method is the customer can purchase the vehicle from Ally at a fixed price set forth in the agreement (the "purchase option"), plus pay the remaining monthly payments owed under the lease.  FAC, ¶ 8, Ex. A, § 32.

The second method is the customer can turn in the vehicle at an Ally authorized dealership ("dealer") and Ally will "sell the vehicle at wholesale."  FAC, ¶ 9, Ex. A, §§ 31, 36.  Under this method, the customer will be charged the remaining monthly payments owed under the lease *minus* any "surplus" on the sale of the vehicle.[1]  *Id.*, § 36(a).  To determine if there is a "surplus," Ally will use the sales price of the vehicle as the "realized value."  *Id.*, § 36(b).  If the realized value exceeds the "residual value" – which is set at the inception of the lease – then the excess is the surplus.  *Id.*  If the surplus is greater than the remaining monthly payments, then there is no early termination charge.  *Id.*

The third method is the customer can obtain an independent appraisal of the vehicle's

---

[1] Ally will also deduct any unearned rent charges from the amount owed.  FAC, ¶ 9 n. 1.

wholesale value.  FAC, ¶ 10, Ex. A, § 36(b).  If the appraised wholesale value is greater than the residual value, then the excess is the "surplus."  *Id.*  If the surplus is greater than the remaining monthly payments, then there is no early termination charge.  *Id.*

The third method is a complete sham.  FAC, ¶ 11.  Under the terms of the Lease, Ally must agree on the independent appraiser before the customer can exercise this option.  *Id.,* Ex. A, § 36(b).  However, as Plaintiff discovered, Ally does not have any procedures for agreeing to an independent appraiser and, thus, the customer cannot exercise this option in the real world.  *Id.* This constitutes a violation of the CLA, because Ally is not accurately disclosing the methods available for determining the early termination charge.  *Id.*; 15 U.S.C. § 1667a(11).

**B.** **Ally's "Early Termination Dealer Purchase for Inventory" Transaction Violates the CLA and Constitutes a Breach of the Lease.**

In addition to the three methods described above, there is a fourth method that is not disclosed in the Lease in violation of the CLA.  FAC, ¶ 12.  Under the fourth method, Ally will sell the vehicle to the dealer where the customer turns in the vehicle as part of an "early termination dealer purchase for inventory" transaction (or "ET DI" transaction for short).  *Id.* Rather than "sell the vehicle at wholesale" as required by the Lease, Ally will sell the vehicle at a higher price equal to: (a) Ally's view of the vehicle's "fair market value," plus (b) the amount Ally will accept to satisfy the customer's early termination obligations.  *Id.*, ¶ 13.

Because the "sales price" or "realized value" that Ally receives from an ET DI transaction typically results in a "surplus" that is greater than the remaining monthly payments, the customer should not owe any early termination charge under the terms of the Lease.  FAC, ¶ 14, Ex. A, § 36(a), (b).  Nevertheless, Ally is aware its agents (the dealers) often will charge customers money as part of an ET DI transaction, even though the customer does not owe any early termination fee. *Id.*  The dealers will then send this money to Ally, which accepts the benefits of the transaction. *Id.*

Ally is fully aware the money it receives from dealers as part of an ET DI transaction will often include improper charges collected from the customer.  FAC, ¶ 16.  In fact, the price Ally charges for the vehicle as part of an ET DI transaction is typically so high that the only way the transaction will make economic sense for the dealer is if the dealer receives some money from the customer.  *Id.*  Otherwise, the dealer would not be able to make a profit when it resells the vehicle. *Id.*  Ally willfully and deliberately turns a "blind eye" to this practice because Ally directly benefits from ET DI transactions and the higher prices it generates for Ally.  *Id.*, ¶18.

2

In sum, Ally violated, and continues to violate, the CLA by: (a) inaccurately stating that customers can obtain an independent appraisal that will be used to calculate the early termination charge even though there is no such procedure available; and (b) failing to disclose the Lease can end as part of an ET DI transaction and the manner for determining the early termination charge as part of that transaction. FAC, ¶ 19. Further, Ally's ET DI transactions breach the terms of the Lease because: (a) Ally is not selling the vehicle at its wholesale value, and (b) customers are being improperly charged money to end the lease early even though they are not supposed to owe any early termination charge based on the sales price Ally receives from the transaction. *Id.*

These violations of the CLA and Ally's related unfair business practices designed to force customers into ET DI transactions also constitute a violation of the Florida Motor Vehicle Disclosure Act (the "FMVLDA") and the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"). FAC, ¶¶ 20, 23-31, 121-155.

### III.     ALLY'S MOTION TO DISMISS SHOULD BE DENIED

#### A.     Legal Standard.

Under Rule 12(b)(6), a motion to dismiss should be granted only if the plaintiff is unable to articulate "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Twombly*, 550 U.S. at 556). When determining whether a claim has facial plausibility, "a court must view a complaint in the light most favorable to the plaintiff and accept all of the plaintiff's well-pleaded facts as true." *Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1066 (11th Cir. 2007). However, a court need not accept allegations as true if they are merely "threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Iqbal*, 129 S. Ct. at 1949. A district court weighing a motion to dismiss asks "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Twombly*, 550 U.S. at 588 n.8.

#### B.     Plaintiff has Properly Stated a Claim for Breach of Contract.

Under Florida law, the elements of a claim for breach of contract action are: (1) a valid contract; (2) a material breach; and (3) damages. *Beck v. Lazard Freres & Co., LLC*, 175 F.3d 913, 914 (11th Cir. 1999). Ally contends that Plaintiff has failed to adequately allege there was a material breach of the Lease and resulting damage. Ally is wrong.

> **1.      Ally Breached the Lease by not Selling Plaintiff's Vehicle at its
> Wholesale Value.**

Plaintiff's Lease provided that if he ended his lease early and did not purchase the vehicle

pursuant to the "purchase option," then Ally would "sell the vehicle at wholesale."  FAC, ¶¶ 51,

104, Ex. A, § 36(b).  The Lease further provided that Ally would "use the sales price of the vehicle"

to calculate the "surplus" and if the "surplus" was greater than the remaining monthly payments,

then Plaintiff would not owe any early termination charge as set forth below.  *Id.*, § 36(a).

36. What You Owe If You End This Lease Before the Start of the Last Monthly Period, and You Do Not Buy the Vehicle - Monthly Payment Lease.
(a) What You Owe: You will owe us an Early End Charge as follows:
   The base monthly payment times the number of payments not yet due,
   • Any unearned rent charge figured by the Actuarial Method (see Section 42), based on the number of full monthly periods between early end and scheduled end
   • Any Surplus (see definition in this section) on the vehicle sale
   = The total. If this total is less than zero, we will not give you a refund or credit.
If there is no Surplus, you will also owe us any Early Excess Mileage and Wear Charge (see definition in this section).

(b) Definition of "Realized Value" and "Surplus": We will sell the vehicle at wholesale. We will use the sale price of the vehicle as its Realized Value, unless you get an independent appraisal of the wholesale value of the vehicle that could be realized at sale (see below in this section). If you get such an appraisal, we will use the appraised value of the vehicle as its Realized Value. If the Realized Value exceeds Residual Value (Section 7(d)), the excess is the Surplus. If the Realized Value is the same as or less than Residual Value, there is no Surplus.

As alleged in the FAC, Ally breached the terms of the Lease by not selling Plaintiff's

vehicle at wholesale.  FAC, ¶¶ 75, 106.  Instead, Ally sold the vehicle to its agent, the Hollywood

Dealership, at a higher "Dealer Purchase for Inventory" price as part of an ET DI transaction.  *Id.*

This price was based on "(a) Ally's view of the 'fair market value' of the vehicle, not the

'wholesale' value, plus (b) the amount Ally was willing to accept in satisfaction of the customers'

early termination obligations."  *Id.*  If Ally did not sell the vehicle at the higher "non-wholesale"

price ($27,575), then the Hollywood Dealership would not have required Plaintiff to pay $1,000

toward that price.  *Id.*, ¶¶ 70, 75, 106.  In other words, as a result of selling the vehicle at this higher

"non-wholesale" price in breach of the Lease, Plaintiff was required to pay money to end the lease

early, even though he did not owe any early termination charges.  *Id.*

In its motion, Ally argues it did not breach the Lease, because Ally contends it sold

Plaintiff's vehicle at "wholesale."  But Ally is simply ignoring the allegations in the FAC.  The

FAC expressly alleges, repeatedly, that "Ally did not sell the leased vehicles at wholesale."  FAC,

¶¶ 75, 106.  Instead, as alleged in the FAC, Ally sold the vehicle at Ally's "view of the 'fair market

value' of the vehicle, not the 'wholesale' value, plus the amount Ally was willing to accept in

satisfaction of the customers' early termination obligations."  *Id.*

Ally contends, in essence, that any sale to a dealer should be considered a "sale at

wholesale" regardless of the price.  In other words, taken to its logical conclusion, Ally contends

that if it sells a vehicle to a dealer for a billion dollars, then *ipso facto* that becomes the "wholesale value" of the vehicle.  Not surprisingly, the evidence will show that is simply not true.  The "fair market value" of a vehicle is different than the "wholesale value."  *See*, *e.g.*, *R.B. v. A.B.,* 2007 WL 1557136, at *3 (Del. Fam. Ct. Apr. 16, 2007) (expert explaining how "sources such as Red Book and NADA consider 'wholesale' to be what an auctioneer would pay," whereas "fair market" or "retail" value is "what a private party would pay.") As CarFax explains:

## What Is Wholesale Value?

Wholesale value, or wholesale price, is how much a dealer pays to buy a vehicle at a <u>used-car auction</u>. This value helps establish a baseline for dealers that informs how much they'll pay for <u>trade-ins</u>, as well as how much they can charge a consumer for a car.

*What Is Wholesale Value? | CARFAX*.  The ET DI price is not the price a dealer would pay at an auction. FAC, ¶ 106.  It is the higher "fair market value" of the vehicle, plus an additional amount to cover the customer's early termination obligations.  *Id.*  Plaintiff has more than plausibly alleged there is a difference, and the Court should allow Plaintiff to prove that an ET DI transaction is not a "sale at wholesale" and, thus, constitutes a breach of the Lease.

Further, to the extent there is any ambiguity about what it means to "sell the vehicle at wholesale," then that ambiguity will be construed against Ally as the drafter and assignee of the Lease.  *See, Chavez v. Mercantil Commercebank, N.A.*, 701 F.3d 896, 902 (11th Cir. 2012) (ambiguities construed against drafter); *Fed. Deposit Ins. Corp. v. Univ. Anclote, Inc.*, 764 F.2d 804, 806 (11th Cir. 1985) (ambiguities construed against assignee).  But even without that presumption, the language in the Lease clearly contemplates that "selling a vehicle at wholesale" means selling the vehicle at its "wholesale value," because the next sentence explains that the customer can obtain an independent appraisal of "the wholesale value" as an alternative to having Ally "sell the vehicle at wholesale."  FAC, Ex. A., § 36(a).  In sum, the FAC plausibly alleges that Ally directly breached the Lease by failing to sell Plaintiff's vehicle at its wholesale value.

### 2.     Plaintiff Has Plausibly Alleged Resulting Damages.

Plaintiff has also plausibly alleged that Ally's failure to sell the vehicle at its wholesale value resulted in Plaintiff's damages.  Specifically, as noted above, if Ally did not sell the vehicle at the higher "non-wholesale" price ($27,575), then the Hollywood Dealership would not have required Plaintiff to pay $1,000 toward that price.  FAC, ¶¶ 70, 75, 106.  Thus, contrary to Defendant's arguments, this breach was the "proximate cause" of Plaintiff's damages.  *Hardwick*

*Properties, Inc. v. Newbern*, 711 So.2d 35, 39-40 (1998) (Florida law allows an injured party to recover damages "as may fairly and reasonably be considered as arising in the usual course of events from the breach of contract itself" as well as consequential damages that were proximately caused by the breach).  As alleged in the FAC, this $1,000 charge was entirely foreseeable to Ally, because otherwise the transaction would not make economic sense for the dealer.  FAC, ¶ 16. Thus, Plaintiff has plausibly alleged resulting damages from Ally's breach.

### C.    Ally is Responsible for the Charges Imposed by Its Agents, the Dealers.

In addition to the breach discussed above, Ally is also vicariously liable for the $1,000 charge as if it directly charged it itself, because it was imposed by its agent (the Hollywood Dealership) "during the course of" its agency relationship with Ally and to "further a purpose and financial interest" of Ally.  FAC, ¶¶ 76-85.  As such, Ally also breached the Lease by charging Plaintiff money to end his Lease early when no such money was owed under the Lease.  *Id.*, ¶ 75. That Ally did this indirectly through an intermediary makes no legal difference.

"General principles of vicarious liability establish that a principal is responsible for the wrongful acts of its agent if the agent was *either* acting '(1) within the scope of its authority, *or* (2) during the course of the agency and to further a purpose or interest of the principal.'"  *Trevarthen v. Wilson*, 219 So.3d 69, 72 (Fla. Dist. Ct. App. 2017) (emphasis added).   An agency relationship can be either express or implied.  2 Fla. Jur. 2d Agency & Employment § 62 (2015).  "An express agency is an actual agency created as a result of the oral or written agreement of the parties."  *Id.* "[A]n implied agency is also an actual agency, the existence of which as a fact is proved by deductions or inferences from the other facts and circumstances of the particular case, including the words and conduct of the parties." *Esso Int'l, Inc. v. S.S. Captain John*, 443 F.2d 1144, 1146 (5th Cir. 1971); *see also Commodity Futures Trading Com'n v. Gilbraltar Monetary Corp., Inc*, 2006 WL 1789018, at *20 (S.D. Fla. May 30, 2006) (J. Dimitrouleas) (same).[2]

To establish an agency relationship, a plaintiff must show "(1) acknowledgment by the principal that the agent will act for him, (2) acceptance by the agent of the undertaking, and (3) control by the principal over the agent's actions."  *Hall v. Sargeant*, 2020 WL 1536435, at *13

---

[2] This is different than an "apparent agency" relationship, which arises "when a principal, either intentionally or through lack of ordinary care, induces third parties to believe that an entity is its agent even though no express or implied authority exists to make that entity an agent." *Commodity Futures*, 2006 WL 1789018, at *21.  Plaintiff is not asserting an apparent agency theory in this case, only an actual agency theory (both express and implied).

(S.D. Fla. March 30, 2020) (quoting *Banco Espirito Santo Int'l, Ltd. v. BDO Int'l, B.V.*, 979 So. 2d 1030, 1032 (Fla. 3d. DCA 2008).) "Unless the alleged agency relationship is to be proven exclusively by analysis of the contract between the principal and agent (in which case the question is an issue of law), the relationship is generally a question of fact and should be analyzed by looking at the totality of the circumstances." *Hall*, 2020 WL 1536435, at *13.

> **1.    Plaintiff has Adequately and Plausibly Alleged that there was an Actual Agency Relationship (Both Express and Implied) Between Ally and the Dealers, Including the Hollywood Dealership.**

In the present case, Plaintiff alleges each of the requisite elements of an "actual agency relationship" including (a) Ally's acknowledgement that the dealers, including the Hollywood Dealership, "would act for [Ally]" in performing Ally's end-of-lease obligations; (b) the dealers' acceptance of those obligations; and (c) Ally's control over the actions of the dealers with respect to those obligations, including ET DI transactions. FAC, ¶¶ 76-79; *Banco*, 979 So. 2d at 1032 (setting forth the requisite elements for an actual agency relationship). The FAC includes a detailed list of at least 14 specific assigned duties that the dealers are authorized to perform for Ally. *Id.* These duties include, *inter alia*, the duty to (a) provide a physical location for customers to turn in their leased vehicles; (b) informing customers on Ally's behalf of their early termination options; (c) inputting the necessary details about the leased vehicle into Ally's computer system so Ally can, among other things, determine the "fair market value of the vehicle and set the ET DI price"; (d) filling out the paperwork with the customer to end the lease early, including the paperwork to complete an ET DI transaction; (e) collecting any money customers pay as part of an ET DI transaction and passing along that money to Ally; and (f) selling the vehicle to the customer at the "purchase option" price if the customer selects that option. *Id.*, ¶ 76(a), (b), (e), (f), (h), (i).

The FAC also provides specific examples of how Ally controls the dealers' actions in the course of the agency relationship, including, *inter alia*, (a) providing step-by-step instructions for how the dealers must perform the tasks described above; (b) directing the dealers about what can and cannot be said about customers' early termination options; (c) setting the quotes for each of the early termination options, including the ET DI price; and (d) having the right to control all aspects of an ET DI transaction. FAC, ¶ 79(a), (b), (c), (f), (h), (i). Plaintiff also notes that Ally pays dealers financial incentives to push customers into ET DI transactions. *Id.*, ¶ 80.

In sum, Plaintiff's FAC does not simply contain "threadbare recitals" or "conclusory statements" about Ally's agency relationship with its dealers. The FAC provides specific examples

of the evidence that will establish the existence of an actual agency relationship. These factual allegations are sufficient to create a triable question of fact on the agency question. *Banco*, 979 So.2d at 1032 (finding question of fact on whether an agency relationship existed where the defendant principal issued detailed guidelines for how the purported agent would perform its duties); *Motor Credit Corp v. Woolverton*, 99 So.2d 286, 290 (Fla. 1957) (holding that dealer was agent of finance company where the dealer had actual or implied authority to repossess and sell the vehicle on behalf of the finance company).

> ### 2. Plaintiff has Adequately and Plausibly Alleged that the Hollywood Dealership was Acting "During the Course" of its Agency Relationship with Ally and to "Further a Purpose or Interest" of Ally when it Charged Plaintiff $1,000 as part of an ET DI Transaction.

Once an actual agency relationship is established, Ally will be vicariously liable for the Hollywood Dealership's actions if the Hollywood Dealership was "either acting '(1) within the scope of its authority, or (2) during the course of the agency and to further a purpose or interest of the principal.'" *Trevarthen*, 219 So.3d at 72. Here, Plaintiff's FAC contains specific factual allegations demonstrating the Hollywood Dealership charged Plaintiff $1,000 to end his lease early "during the course of the agency and to further a purpose or interest "of Ally. FAC, ¶ 83.

*First*, the $1,000 charge was imposed "during the course of the agency" with Ally. The reason Plaintiff was at the Hollywood Dealership in the first place was because Ally exercised its contractual right to require Plaintiff to turn in his leased vehicle at an Ally authorized dealer. FAC, ¶ 82, Ex. A, § 31 (contractual provision requiring customers to turn in their leased vehicle "to any reasonable place we tell you"); *see also* ¶¶ 57, 64 (explaining how an Ally representative informed Plaintiff he would need go to an Ally authorized dealer and the Ally website listed the Hollywood Dealership as one such authorized dealer.) Ally argues that Florida law required Plaintiff to return the vehicle through a licensed automotive dealer. Mot. at 1, 3 n. 3. But this only proves the agency relationship. Ally needed to work through the Hollywood Dealership to perform its end-of-lease obligations under the Lease, because Ally did not obtain a license to do so on its own.

During the course of the agency relationship, Ally also authorized the Hollywood Dealership to explain to Plaintiff his early termination options, including the ET DI option. FAC, ¶ 76(a), (b) and (c). In fact, Ally provided the Hollywood Dealership with a document entitled "Vehicle Payoff Quote: SmartLease Early Termination Quote" which listed the three early termination options and the estimated cost of each option, including the "Dealer Purchase for

Inventory" price.  *Id.*, ¶¶ 65, 67, Ex. E.

In addition, as part of its agency relationship, Ally also authorized the Hollywood Dealership to fill out the paperwork to end the lease early, including the necessary paperwork to complete an ET DI transaction.  FAC, ¶ 76(f).  That paperwork demonstrates that the $1,000 charge was imposed "during the course" of this agency relationship.  For example, the "Lease Termination Payoff Authorization and Verification Agreement" lists the $27,575 ET DI price as the "payoff" amount owed to Ally as the lessor.  *Id.*, ¶ 72, Ex. F.

| | BUYERS/LESSEE TRADE-IN OR LEASE TERMINATION PAYOFF AUTHORIZATION AND VERIFICATION AGREEMENT | |
|---|---|---|
| Dealer: | Hollywood Chrysler Jeep | |
| Buyer/Lessee: | ISAAC MARCUSHAMER | VIN: 2 C 4 R C 1 G G 3 H R 6 7 0 3 4 4 |
| Description of Vehicle: 2017 | Chrysler | Pacifica | Current Mileage: 29066 |
| | Year | Make | Model |
| Name on Account: | Isaac Marcushamer | |
| Account Number: | | |
| Name of Lienholder/Lessor: | ALLY FINANCIAL | |
| Lienholder Address: | 6716 GRADE LN BLG 9 SUITE 910 | |
| City/State/Zip: | LOUISVILLE KY 40213 | Phone: |
| Amount: | 27,575.00 | Per day if Applicable: |
| Date Payoff Verified: 9/1/20 | Good Until: 9/8/20 | Payoff Given By: ONLINE |
| LEASE | | |

The "Purchase Form" that Plaintiff simultaneously executed also indicates that the $1,000 was being paid as part of the $27,757 "payoff" to Ally.  *Id.*, ¶ 73, Ex. G.



Ally notes that its "Vehicle Payoff Quote" – which was not supposed to be shown to Plaintiff – contains fine print indicating that the dealer must not show any portion of a "Dealer Purchase for Inventory" price as a "payoff" amount.  Mot. at 4 (citing FAC, Ex. E.)  Ally contends this document somehow confirms that the Hollywood Dealership "had no authority from Ally to charge Plaintiff any money on Ally's behalf upon his exercise of the Return Option."  *Id.* at 10. Notably, contrary to Ally's contentions, this document does not contain any instructions prohibiting dealers from charging customers money as part of an ET DI transaction. FAC, Ex. E. In contrast, the document expressly prohibits dealers from charging customers fees if they exercise the "purchase option" (the third option listed on the sheet).  *Id.* ("On a Dealer Purchase for Lessee buyout, you may not charge the lessee an administrative, documentary, or other unofficial fee.") So, Ally knows how to expressly instruct dealers not to charge customers money when it truly wants to prohibit such charges.  *Id.*

9

But it is ultimately irrelevant whether Ally expressly authorized the Hollywood Dealership to charge Plaintiff $1,000, because it does not change the fact that the charge was imposed "during the course" of the agency of relationship.  As *Trevarthen* explains, the test for vicarious liability is stated in the alternative: "A principal is responsible for the wrongful acts of its agent if the agent was *either* acting '(1) within the scope of its authority, *or* (2) during the course of the agency and to further a purpose or interest of the principal.'" *Trevarthen*, 19 So.3d at 72. (emphasis added).  In other words, even if Ally did not give the Hollywood Dealership authority to charge Plaintiff $1,000 as part of the paperwork to end the lease, Ally is still vicariously liable for the charge, because the Hollywood Dealership imposed it "during the course of the agency and to further a purpose or interest of the principal."[3]  *Id.*

In addition, even assuming *arguendo* the $1,000 charge was not imposed "during the course of the agency" (and it clearly was), "a principal may still be liable for the acts of its agent which were outside the scope of the agent's authority if the principal subsequently ratifies the actions."  *Trevarthen*, 219 So.3d at 72. "When an agent acts for his principal, and the principal accepts the fruits of the agent's efforts, the principal must be deemed to have adopted the methods employed, and he may not, even though innocent, receive the benefits and at the same time disclaim responsibility for the means by which they were acquired." *Id.*

That is exactly what Plaintiff alleges in this case.  The FAC expressly states that "Ally was aware that dealers, including the Hollywood Dealership, were charging customers money as part of an ET DI transaction, and nevertheless accepted the benefits of the transaction."  FAC, ¶ 85. The FAC further alleges that "Ally is fully aware that the money it receives from dealers as part of an ET DI transaction will often include improper charges collected from the customer." *Id.*, ¶ 16. The FAC explains that Ally knows this is occurring because "the price Ally charges for vehicles as part of an ET DI transaction is typically so high that the only way the transaction will make economic sense for the dealer is if the dealer receives some money from the customer." *Id.*   The FAC further alleges that "Ally willfully and deliberately turns a 'blind eye' to this practice because Ally directly benefits from ET DI transactions and the higher prices Ally generates from these transactions." *Id.*, ¶ 18.  In sum, it is irrelevant whether Ally was aware that the Hollywood

---

[3] Ally also notes that the Hollywood Dealership also did not have the authority to amend the Lease. Mot. at 9.  But this is irrelevant because the Hollywood Dealership did not *amend* the Lease.  The Hollywood Dealership charged Plaintiff $1,000 to end the Lease early in breach of the agreement. FAC, ¶¶ 75, 106.

Dealership was specifically imposing this charge on Plaintiff, because Ally is generally aware of the practice and willfully turns a "blind eye" to the practice.

*Second*, as established above, the $1,000 charge was imposed to "further a purpose or interest" of Ally. *Trevarthen*, 219 So.3d at 72. As alleged in the FAC and established by the documents attached to the FAC, the $1,000 charge was immediately passed on to Ally as part of the $27,575 lease "payoff" to Ally. FAC, ¶¶ 72-73, 83-84, Exs. F, G. In fact, the primary purpose of an ET DI transaction is to financially benefit Ally, because Ally receives higher prices than it would otherwise receive if it sold the vehicle at "wholesale" as required by the Lease. *Id.*, ¶¶ 13, 6, 18, 84. In sum, there is more than sufficient evidence for Plaintiff to plausibly allege that the $1,000 charge was imposed to "further a purpose or interest" of Ally.

### 3.     Ally's Attempt to Characterize the ET DI Transaction as an Independent Transaction from the Lease is Unavailing.

Ally attempts to characterize the ET DI transaction and $1,000 charge as independent agreements with the Hollywood Dealership that have nothing to do with the Lease. This is clearly not true. Ally required Plaintiff to exercise his early termination options at the Hollywood Dealership. FAC, ¶¶ 48, 57, 64, 82, Ex. A, § 31. Ally set the $27,575 price to buyout the lease early. *Id.*, ¶¶ 54, 72-75, Exs. F, G. Ally was the ultimate recipient of the $1,000 charge. *Id* And, Plaintiff was required to pay the $1,000 as part of the same paperwork to end the Lease early. *Id.*

The law is well established that two or more documents executed by the same parties, at or near the same time, and concerning the same transaction or subject matter are generally construed together as a single contract. *Clayton v. Howard Johnson Franchise Sys., Inc.,* 954 F.2d 645 (11th Cir. 1992). Consequently, to claim that the $1,000 charge was separate and independent from the termination of the Lease is a fiction that is not supported by the facts and cannot be adopted on a motion to dismiss. *Am. United Life Ins. Co. v. Martinez*, 480 F.3d at 1066 (a court must construe the allegations in a light most favorable to the plaintiff); *Cox v. Porsche Financial Servs., Inc.*, 342 F.Supp.3d 1271, 1282-83 (S.D. Fla. 2018) (rejecting finance company's characterization of a transaction as two separate transactions).

If Ally had instructed the Hollywood Dealership to collect $1,000 from Plaintiff to end his lease early and then give the $1,000 to Ally, there would be no question that Ally's breached the Lease. But that is effectively what happened here. Instead of selling the vehicle to the Hollywood Dealership at wholesale as required under the Lease, Ally "jacked up" the price to a point where

the only way it would make economic sense for the dealer would be if it collected $1,000 from Plaintiff. The dealer then sent that money to Ally. Under both scenarios, Plaintiff is being required to pay $1,000 to end his lease early, and Ally is receiving the money.

In any event, Ally's efforts to "spin" the transaction as an independent "side deal" does not change the fact that Ally separately breached the Lease by failing to "sell the vehicle at wholesale" as promised. *Supra* § II. B. Absent that breach, Plaintiff would not have incurred the $1,000 charge to end his lease early. *Id.* This is true regardless of whether this charge is being characterized as a "side deal" or a payment under the Lease. *Id.*

### 4. Ally's Implicit Reliance on the "Voluntary Payment Doctrine" is Misplaced.

Although not articulated in this fashion, Ally appears to be arguing that Plaintiff's claims should be barred by the "voluntary payment doctrine." Under this doctrine, if a party voluntarily pays money "with full knowledge of all the facts" then it cannot recover the money even if the charge was unlawful." *Brink v. Raymond James & Associates, Inc.*, 341 F.Supp.3d 1314, 1319 (S.D. Fla. 2018) (J. Dimitrouleas). However, as this Court previously recognized, this doctrine has a "narrow application." *Id.* It only applies if the undisputed facts establish that the person who made the payment had "full knowledge of the relevant facts." *Id.* at 1320. Moreover, "because the voluntary payment doctrine requires the party asserting it to show that the person who made the payment had full knowledge of the relevant facts, including the allegedly wrongful conduct, the doctrine is ordinarily treated as an affirmative defense that may not be raised on a motion to dismiss."[4] *Carrero LVNV Funding, LLC*, 2014 WL 6433214, at *6 (Oct. 27, 2014).

Here, to claim that Plaintiff "voluntarily" agreed to this transaction is a stretch. Plaintiff tried to exercise the Lease's independent appraisal option but discovered Ally did not offer that option in the real world. FAC, ¶¶ 60-63, 69. He also tried to sell his vehicle to CarMax, or exercise his purchase option through CarMax, but Ally informed him he was prohibited from doing so under company policy. *Id.*, ¶¶ 53-56. Thus, the only option Plaintiff had that would allow him to know the cost of the early termination up front was the ET DI transaction. *Id.*, ¶¶ 23-31. As alleged in the FAC, this is how Ally deliberately and improperly pushes customers into ET DI transactions, which generate greater profits for Ally at the expense of its customers. *Id.*

---

[4] Plaintiff objects if Ally attempts to rely on this doctrine on reply, because it did not move on this affirmative defense in its motion to dismiss.

In any event, the voluntary payment doctrine is inapplicable to the present case, because Plaintiff did not have full knowledge of the relevant facts.  Plaintiff did not know that the Hollywood Dealership was not authorized to charge Plaintiff money as part of that transaction. Mot. at 10 (stating that Ally did not authorize the charge).  Plaintiff did not know that the $27,575 price was based on Ally's view of the "fair market value" of the vehicle rather than Ally's view of the "wholesale value" as promised in the Lease.  FAC, ¶ 75.  Plaintiff did not know that the "Dealer Purchase for Inventory" price also included what Ally was willing to accept in full satisfaction of Plaintiff's early termination obligations.  *Id.*  Had Plaintiff known this information, he would have been alerted to the fact that the dealer was not supposed to charge him any money as part of an ET DI transaction.  Instead, he was provided with paperwork indicating the $27,575 was the "lease payoff" amount owed to Ally.  *Id.*, ¶¶ 72-73. This is why the "voluntary payment doctrine" requires an examination of the evidence to determine whether the party had full knowledge of the relevant facts and why this defense cannot normally be adjudicated on a motion to dismiss.  *Schojan v. Papa John's Intern. Inc.*, 34 F.Supp.3d 1206, 1211 (M.D. Fla. 2014).

In addition, Florida enacted § 725.04, Florida Stat. which created an exception to the voluntary payment doctrine and substantially narrowed the scope of its application.  *Brink*, 341 F.Supp.3d at 1321-22.  This statute provides that "[w]hen a suit is instituted by a party to a contract to recover a payment made pursuant to the contract and by the terms of the contract there was no enforceable obligation to make the payment, the defense of voluntary payment may not be interposed by the person receiving the payment."  *Id.* at 1322.  From Plaintiff's perspective, the $1,000 payment was made "pursuant to" the Lease because this is what he was being required to pay to end his lease early.  The fact that it was charged by Ally indirectly through an intermediary does not change the fact that it was an impermissible charge under the terms of the Lease.  *Supra* § III.C. (establishing that Ally is vicariously liable for its agent's actions).  Thus, this statutory exception provides an independent basis why the voluntary payment doctrine is inapplicable here.

### D.  Plaintiff Has Properly Alleged a Violation of the CLA and Regulation M.

Plaintiff has properly alleged two separate violations of the CLA and Regulation M.  The CLA was passed by Congress as an amendment to the Truth in Lending Act ("TILA") to assure "meaningful disclosure of the terms of leases."  *Cox.*, 342 F.Supp.3d at 1281.  It is a "remedial statute" that is "designed to protect borrowers" and must be "construed liberally in favor of borrowers."  *Id.*; *Carmichael v. Nissan Motor Accept. Corp.*, 291 F.3d 1278, 1280 (11th Cir. 2002).

As noted above, the CLA requires Ally[5] to provide a written statement in its lease agreement setting out "accurately and in a clear and conspicuous manner" information about the lease, including "[a] statement of the conditions under which the lessee or lessor may terminate the lease prior to the end of the term and the amount or method of determining any penalty or other charge for . . . early termination." 15 U.S.C. § 1667a(11); 12 C.F.R. § 213.4(g)(1). Plaintiff alleges Ally violated this provision of the CLA in two independent ways.

*First,* Plaintiff contends that Ally's Lease inaccurately states that a customer can obtain an "independent appraisal of the wholesale value of the vehicle" that will be used to calculate the early termination charge. FAC, ¶¶ 11, 117(a); Ex. A, § 36(b).  This method is illusory because Ally must first consent to the independent appraiser, and Ally has no procedures for agreeing to an appraiser. *Id.* Thus, this method cannot be exercised in the real world. *Id.*

Ally's motion ignores these allegations and characterizes Plaintiff as being "dissatisfied with the process." Mot. at 3.  But this is not an issue about being "dissatisfied with the process." *There is no process!* As Plaintiff discovered, "Ally does not have any procedures in place for agreeing to an independent appraiser and does not provide any readily available means for a customer to obtain Ally's consent to an independent appraiser." FAC, ¶¶ 11, 60-63, 69.  Under the CLA, Ally is required to "accurately" disclose the methods for calculating the early termination charge. 15 U.S.C. § 1667a(11); 12 C.F.R. § 213.4(g)(1).  Disclosing an illusory method that does not actually exist in the real world is not an "accurate" disclosure. *See*, *e.g.*, *Baez v. P Baez v. Potamkin Hyundai, Inc.,* 2010 WL 11553183, at *4 (S.D. Fla. 2010) (plaintiff adequately alleged defendant violated TILA by including illusory disclosures); *Yung Kim v. Gen. Motors, LLC*, 99 F. Supp. 3d 1096, 1108 (C.D. Cal. 2015) (finding that "miles per gallon" disclosure was misleading because it could not be attained when driving in the real world.)

*Second*, Plaintiff alleges that Ally also violated the CLA by failing to disclose that the lease could end as part of an ET DI transaction and the manner for determining the early termination charge as part of that transaction. FAC, ¶ 117(b).  The application of an "undisclosed method for calculating an early termination charge" is a violation of the CLA.  *Miller v. Nissan Motor Acceptance Corp.*, 362 F.2d 209, 218-19 (3rd Cir. 2004) (failing to disclose that there was an

---

[5] The CLA applies to any "lessor" who "regularly engages in leasing, offering to lease, and/or arranging to lease under a consumer lease."  15 U.S.C. § 1667(3).  Finance companies, like Ally, may be held liable as "lessors" the under the CLA, even when the lease agreement was initially entered between the plaintiff and a dealer. *Cox*, 342 F. Supp.3d at 1285.

alternative method for calculating the early termination charge constituted a violation of the CLA); *Kedziora v. Citicorp Nat. Servs.*, *Inc.*, 901 F.Supp. 1321, 1325-26 (N.D. Ill. 1995) (application of undisclosed method for calculating early termination charge is a violation of the CLA); *see also Highsmith v. Chrysler Credit Corp.*, 18 F.3d 434, 438-39 (7th Cir. 1994) (failure to disclose portion of formula used to calculate early termination charge is a violation of the CLA); *Channell v. Citicorp Nat'l Servs., Inc.*, 89 F.3d 379, 383-84 (7th Cir. 1996) (using actuarial method to calculate early termination charge, when lease disclosed that the lessor would use the "Rule of 78s" was a violation of the CLA, even though it benefited the consumer); *Applebaum v. Nissan Motor Acceptance Corp.*, 226 F.3d 214, 223 (3rd Cir. 2000) (failure to disclose value of a variable that is essential component of the formula used in calculating charge is a violation of the CLA).  This is the case even when the undisclosed method is more favorable for the customer.  *Id.*

In an astounding exercise of circular logic, Ally argues that because the Lease does not disclose the "Dealer Purchase for Inventory" option, there is no "Dealer Purchase for Inventory" method for calculating the early termination charge under the Lease.  Mot. at 11-12.  Except the FAC expressly alleges this is one of the options used for determining the end of lease charge, and it was one of three options provided when Plaintiff attempted to end his lease early. FAC, ¶¶ 12-19, 65, 67, 70, Ex. E.

Ally is required to disclose this condition for terminating the Lease under the CLA because it is a "method of determining any penalty or other charge for . . . early termination." 15 U.S.C. § 1667a(11); 12 C.F.R. § 213.4(g)(1).  In fact, as noted above, it conflicts with the other disclosed methods, because Ally is not using the "wholesale" value of the vehicle when calculating the early termination charge.  FAC, ¶ 13.  If Ally had properly disclosed this method in the Lease, then Plaintiff would have known he was not supposed to be charged $1,000 to end his lease early by the Hollywood Dealership.  FAC, ¶ 118.  For example, in Section 36 of the Lease -- where Ally explains how the "Early End Charge" is calculated -- Ally could have disclosed this alternative method for determining the early termination charge as follows:

> In the alternative to selling the vehicle at wholesale, We may elect to sell the vehicle at our view of the fair market value of the vehicle, plus the amount We are willing to accept to satisfy your early termination obligations.  If We choose this option, You will not owe any money to end the lease early.

Or, if Ally is going to allow its authorized dealers to charge customers money as part of this transaction, then Ally must disclose how that charge is going to be determined to comply with the

15

CLA. 15 U.S.C. § 1667a(11). Without this disclosure, Ally's customers do not know what the true cost of an early termination will be, nor have a means for determining that charge, which is a violation of the CLA. *Miller*, 362 F.2d at 218-19; *Highsmith*, 18 F.3d at 438-39.

### E.      Plaintiff has Properly Alleged a Violation of the FMVLDA.

Plaintiff has properly alleged a violation of the FMVLDA. In its motion, Ally correctly notes that under the FMVLDA Ally had the option of either complying with CLA's disclosure requirements or using the Florida-specific disclosures set out in the statute. Mot. at 12.[6] Ally elected to use the CLA's disclosure requirements. *Id.*; FAC, ¶ 126. Thus, because Ally did not accurately disclose the methods for determining the early termination charge under the CLA, that violation likewise constitutes a violation of the FMVLDA. *Supra* § III.D.

### F.      Plaintiff has Properly Alleged Violations of FDUTPA.

Plaintiff has also properly alleged the requisite elements for a claim under FDUTPA. The elements of a consumer claim for damages under FDUTPA are: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages. *Cox*, 342 F. Supp.3d at 1286. A plaintiff can also obtain injunctive relief under FDUTPA if it shows the conduct complained of was unfair and deceptive and the plaintiff was aggrieved by such acts. *Ordonez v. Icon Sky Holdings, LLC*, 2011 WL 3843890, at *8 (S.D. Fla. Aug. 30, 2011).

In the FAC, Plaintiff alleges that Ally violated FDUTPA in two ways: (1) Ally failed to accurately disclose the methods for determining the early termination charge; and (2) Ally categorically and unfairly refuses to allow consumers to transfer their right to purchase the vehicle at the "purchase option" price, even though Ally will fully recover everything owed to Ally under the Lease, in order to push customers into ET DI transactions. FAC, ¶¶ 140-141.

#### 1.      Ally's Violations of the CLA and FMVLDA Constitute *Per Se* Violations of FDUTPA.

Section 501.203(3)(c), Fla. Stat. provides that a *per se* violation of FDUTPA may be founded on the alleged violation of "[a]ny law, statute, rule, regulation, or ordinance which

---

[6] The FMVLDA is a Florida statute that requires certain information to be prominently disclosed in an auto lease. Fla. Stat. § 521.004(1). In the alternative, the FMVLA provides that some of this information is "not required to be disclosed if . . . **the descriptions and disclosures set forth and required by the [CLA] and [Regulation M], are set forth elsewhere in the lease agreement**." *Id.* (emphasis added). In other words, if the lessor complies with federal disclosure regime, it does not have to strictly comply with Florida's disclosure requirements. *Id.*

proscribes unfair methods of competition or unfair, deceptive, or unconscionable acts or practices." *Cox*, 342 F. Supp. 3d at 1287.  The CLA, which is an amendment to the TILA, falls under this definition.  *Id.* (citing *Jones v. TT of Longwood, Inc.*, 2006 WL 2789140, at \*6 (M.D. Fla. Sept. 26, 2006) (finding violation of TILA is a *per se* violation of FDUTPA).)  Thus, Ally's alleged violations of CLA and FMVLDA constitute a *per se* violation of FDUTPA.

Further, even if they were not a *per se* violation (which they are), this conduct would still constitute a deceptive and unfair practice.  While the Florida legislature has not specifically defined what a "deceptive act or unfair practice" is, it has mandated that FDUTPA "shall be construed liberally."  Fla. Stat. § 501.202.  Courts in this district define a "deceptive act" as one where a "representation, omission, or practice occurred that was likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *Lombardo v. Johnson & Johnson Consumer Companies, Inc.*, 124 F.Supp.3d 1283, 1287 (S.D. Fla. 2015).  An "unfair practice" is one that "offends established public policy and ... is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Id.*  "Whether [specific] conduct constitutes an unfair or deceptive trade practice is a question of fact for the jury to determine." *State Farm Mut. Auto. Ins. Co. v. Performance Orth. & Neurosurgery, LLC*, 278 F. Supp. 3d 1307, 1316 (S.D. Fla. 2017).

Including an illusory appraisal option in the Lease when Ally knows it does not have any procedures that would allow the customer to exercise that option is clearly a deceptive practice. Likewise, setting up an ET DI system that Ally knows is going to result in its agents (the dealers) improperly charging customers money that is not owed under the Lease "offends established public policy and ... is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."  Ally is essentially indirectly charging an early termination fee through its dealers that it knows it cannot charge directly.  Plaintiff has plausibly alleged violations of FDUTPA.

## 2.     Plaintiff was Harmed and Aggrieved by Ally's Failure to Accurately Disclose the Methods for Calculating the Early Termination Charge.

Contrary to Ally's arguments, Plaintiff was personally harmed and aggrieved by Ally's failure to accurately disclose the methods for calculating the early termination charge.  As alleged in the FAC, if Plaintiff had been allowed to use the appraisal option, he would not have been charged any money to end his lease early.  FAC, ¶¶ 62-63.  Similarly, if Ally had properly disclosed the ET DI method for calculating the early termination charge, then Plaintiff would have known he was not supposed to be charged $1,000 to end his lease early and he would not have paid such

an amount.  FAC, ¶¶ 118, 129.  In each instance, Ally's actions proximately caused Plaintiff to pay $1,000 he would not have otherwise paid thereby resulting in actual damages.  *Id.*

Further, "[a] proven violation of the [CLA's] disclosure requirements is presumed to injure the borrower by frustrating the purpose of permitting consumers to compare various available credit terms."  *Cox*, 342 F.Supp.3d at 1281; *Herrera v. First Northern Sav. & Loan Ass'n*, 805 F.2d 896, 901 (10th Cir. 1986) (same).  This is why the CLA and FMVLDA provide an alternative statutory penalty in lieu of monetary damages.  15 U.S.C. § 1640(a)(2)(A), (B); Fla. Stat. § 521.006(1).  In sum, Plaintiff suffered the requisite harm to assert a claim for damages and injunctive relief under FDUTPA.

Ally argues it cannot be held liable under FDUTPA for a charge imposed by the Hollywood Dealership.  However, in *Cox*, the court recognized that a finance company can be held liable under FDUTPA, even though the deceptive practice was initiated by the dealer.  *Cox*, 342 F.Supp.3d at 1288.  Moreover, where, as here, the defendant actively participated in the deceptive scheme, such allegations are sufficient to establish FDUTPA liability.  *Id.*; *Galstaldi v. Sunvest Communities USA, LLC*, 637 F.Supp.2d 1045, 1056-57 (S.D. Fla. 2009).  As alleged in the FAC, Ally is aware its dealers are improperly charging customers money as part of an ET DI transaction and knowingly accepts the benefits of the transaction because of the higher profits it generates for Ally.  FAC, ¶¶ 16, 18, 85.  Ally is a full and direct participant and beneficiary of this scheme.  *Id.*

### 3.   Ally's Blanket Prohibition on Transferring the Purchase Option Constitutes a Deceptive and Unfair Practice.

The FAC also details how Ally unfairly pushes customers into ET DI transactions by making this the only option available for customers to know the cost of an early termination up front at the time they turn in their vehicle.  *First*, as noted above, Ally does not enable customers to exercise the appraisal option under the Lease. FAC, ¶¶ 11, 60-63, 69.  *Second*, Ally does not permit customers to indirectly exercise the "purchase option" through a dealer, even though Ally would receive *every penny* it was entitled to under the Lease.  *Id.*, ¶¶ 26-28.  Instead, Ally forces dealers to pay the higher ET DI price to Ally and prohibits dealers from selling the car to the customer at the lower "purchase option" price and immediately purchasing it back from them.  *Id.*

For example, assume the customer could purchase the vehicle from Ally for $24,000 under the Lease's "purchase option."  FAC, ¶ 28.  If a dealer was willing to pay $25,000 for the vehicle, then Ally would receive everything it would be entitled to under the Lease.  *Id.* Instead, to make

18

more money, Ally will offer to sell the car to the dealer for $26,000 through an ET DI transaction and will refuse to allow the customer to transfer the right to purchase the vehicle to the dealer at the lower "purchase option" price of $24,000, even though the latter option would ensure that Ally would receive the full amount it is entitled to under the Lease. *Id.* The only reason Ally does this is to force dealers to pay Ally a higher ET DI price, even though Ally knows the dealers will turn around and charge its customers money as part of the transaction to end the lease early.

Ally correctly notes the Lease contains a provision prohibiting customers from transferring any right or interest under the Lease without Ally's prior written consent. Mot. at 15. However, the Lease does not provide any standards for how Ally will exercise its discretion to consent to such transfers. FAC, ¶ 142, Ex. A., § 45. As a result, under Florida law, when one party has the power to make a discretionary decision without defined standards, such consent must be exercised pursuant to the contracting parties' reasonable commercial expectations." *See, e.g., Speedway SuperAmerica, LLC v. Tropic Enterprises, Inc.*, 966 So.2d 1, 3-4 (Fla. 2d DCA 2007).

Plaintiff alleges that Ally's policy of blanketly prohibiting the transfer of the "purchase option" to a dealer is a deceptive and unfair practice. FAC, ¶¶ 142-44. There is no reasonable basis for Ally to categorically refuse to allow customers to transfer their rights to purchase the vehicle at the "purchase option" price, given that Ally will fully recover everything owed to Ally under the lease agreement. *Id.* This is an unreasonable and unfair business practice that is not in compliance with the parties' reasonable commercial expectations. *Id.* It is unethically designed to enable Ally to obtain a higher ET DI prices from the dealer at the expense of its customers. *Id.* Plaintiff was injured by this practice because, absent the practice, Plaintiff would have sold his vehicle through CarMax and not owed any early termination charges – and in fact would have made a profit on the deal. *Id.*, ¶¶ 53-58. Whether this practice is unfair and deceptive is a question of fact for the jury. *State Farm,* 278 F. Supp. 3d at 1316.

Ally argues this is simply an attempt to convert a breach of contract claim into a FDUTPA claim. However, Florida law does not prohibit plaintiffs from pursuing a separate FDUTPA claim related to an alleged breach of the contract, so long as the act giving rise to the breach also constitutes an alleged unfair or deceptive trade practice. *Kenneth F. Hackett & Assocs., Inc. v. GE Capital Info. Tech. Sols., Inc.*, 744 F. Supp. 2d 1305, 1313 (S.D. Fla. 2010) (denying dismissal of a FDUTPA claim that "allege[s] something more than a mere breach"). Here, the wrongful practice in question is not a "mere breach" and, in fact, may not even constitute a breach of the agreement.

19

Instead, Plaintiff is challenging the unfair manner in which Ally is exercising its contractual right to prohibit transfers of the "purchase option." This properly states a claim under FDUTPA beyond a "mere breach." *Id.*; *see also Martorella v. Deutsche Bank Nat. Trust Co.*, 931 F.Supp.2d 1218, 1223-25 (S.D. Fla. 2013) (finding that same conduct that constituted a breach of the implied covenant of good faith and fair dealing also constituted a violation of FDUTPA). Because Plaintiff was harmed by this practice, he has standing to assert claims for damages and injunctive relief.

      **G.**      **The FAC is not an Improper Shotgun Pleading.**

      Ally's "shotgun pleading" argument is without merit. Mot. at 16-17.

      *First*, Ally inaccurately contends the FAC impermissibly incorporates the allegations from prior counts. However, the FAC does not do this. The breach of contract count and the CLA counts only incorporate the general background allegations that provide the factual basis for the claims; they do not incorporate the allegations in the other counts. FAC, ¶¶ 100, 111. While the FMVLDA count incorporates the allegations from the CLA count (FAC, ¶ 121), it purposely does so because a violation of the CLA constitutes a violation of the FMVLDA. *Supra* § III.E. Likewise, the FDUPTA count incorporates the CLA and FMVDLA counts (but not the breach of contract count) (FAC, ¶ 133), because a violation of the CLA and FMVLDA is a *per se* violation of FDUPTA. *Supra* § III.F.1. The Eleventh Circuit expressly found this type of incorporation by reference is appropriate and does not constitute impermissible "shotgun pleading." *Weiland v. Palm Beach Cty. Sheriff's Off.*, 792 F.3d 1313, 1324 (11th Cir. 2015).

      *Second*, Ally is correct that the FAC does not distinguish between defendants, because his Lease interchangeably refers to both Ally entities as if they were the same entity. FAC, ¶ 43, Ex. A., p. 1. Plaintiff cannot be expected to know the distinction between the two when it is not discernable from the Lease. This does not provide grounds for a motion to dismiss. *N.R. by Ragan v. Sch. Bd. of Okaloosa Cty., Fla.*, 418 F. Supp. 3d 957, 976 (N.D. Fla. 2019) (refusing to dismiss complaint as shotgun pleading where "related defendants" were grouped).

## IV.    CONCLUSION

      For the foregoing reasons, Ally's motion to dismiss should be denied. In the alternative, Plaintiff should be provided leave to amend.

Dated:  July 19, 2021                    Respectfully submitted,

FRANK SIMS & STOLPER LLP
19800 MacArthur Blvd., Suite 855
Irvine, CA 92612
Telephone: (949) 201-2400
Facsimile: (949) 201-2405

By: s/ Jason M. Frank_____
JASON M. FRANK
CA Bar No. 190957 (*Pro Hac Vice*)
SCOTT H. SIMS
CA Bar. No. 234148 (*Pro Hac Vice*)

and

WEISS HANDLER & CORNWELL, P.A.
2255 Glades Road, Suite 205-East
Boca Raton, FL 33431
Telephone: (561) 997-9995
Facsimile: (561) 997-5280

By: s/William J. Cornwell_____
WILLIAM J. CORNWELL, ESQ.
FL Bar. No. 782017
wjc@whcfla.com
filings@whcfla.com
lm@whcfla.com

*Attorneys for Plaintiff and the Classes*